RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0309P (6th Cir.)
File Name: 02a0309p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

No. 01-1561
UNITED STATES OF AMERICA,
   _Plaintiff-Appellee,_

   _v._

PAUL CORRADO,
   _Defendant-Appellant._

Nos. 01-1658/1660
UNITED STATES OF AMERICA,
   _Plaintiff-Appellant/_
   _Cross-Appellee,_

   _v._

ANTHONY CORRADO,
   _Defendant-Appellee/_
   _Cross-Appellant._

Nos. 01-1561/
1658/1660

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 96-80201—John Corbett O'Meara, District Judge.

Argued: April 26, 2002

Decided and Filed:  September 10, 2002

Before:  DAUGHTREY and MOORE, Circuit Judges;
         ECONOMUS, District Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:** Robert M. Morgan, Detroit, Michigan, Carole M. Stanyar, Detroit, Michigan, for Defendants.  Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Plaintiff.  **ON BRIEF:**  Robert M. Morgan, Detroit, Michigan, Carole M. Stanyar, Detroit, Michigan, for Defendants.  Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Plaintiff.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge.  Defendants Paul Corrado ("Paul") and Anthony Corrado ("Anthony") appeal the district court's reinstatement of their convictions, following remand, and their sentences following resentencing. The United States cross-appeals Anthony's sentence. For the following reasons, we **AFFIRM** the reinstatement of the Corrados' convictions and Paul's sentence, but we **VACATE** Anthony's sentence and **REMAND** to the district court for resentencing.

**I. BACKGROUND**

Paul and Anthony, along with fifteen others, were charged in a twenty-five count indictment that included two counts

_____

[*] The Honorable Peter C. Economus, United States District Judge for the Northern District of Ohio, sitting by designation.

under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and several extortion, conspiracy, and firearm counts. *See United States v. [Paul] Corrado*, 227 F.3d 528, 532 (6th Cir. 2000) ["*Corrado I*"]; *United States v. [Anthony Joseph] Corrado*, Nos. 98-2394 & 99-1001, 2000 WL 1290343, at *1 (6th Cir. Sept. 8, 2000) ["*Corrado II*"]. Paul and Anthony were allegedly members of the Detroit Cosa Nostra; Paul, the nephew of Anthony, engaged in a scheme with Nove Tocco to "shake down" bookmakers in the Detroit metropolitan area, allegedly under the supervision of Anthony, a Mafia "capo," and others. The extensive underlying facts of the case can be found in the opinions cited *supra*. *See also United States v. Corrado*, 286 F.3d 934 (6th Cir. 2002) (forfeiture-related issues) ["*Corrado IV*"]; *United States v. Corrado*, 227 F.3d 543 (6th Cir. 2000) (same) ["*Corrado III*"]; *United States v. Tocco*, 200 F.3d 401 (6th Cir. 2000) (appeal of coconspirator Jack Tocco).

After a jury trial, Paul was convicted on Counts 1 (RICO conspiracy, 18 U.S.C. § 1962(d)), 6 (Hobbs Act conspiracy violation, 18 U.S.C. § 1951(a), conspiracy to interfere with commerce by extortion), 10, 12, 20, 23, 24 (Hobbs Act substantive violations, interference with commerce by extortion), 11, 17, 21 (Hobbs Act attempt violations, attempted interference with commerce by extortion), 5, 9, and 16 (using or carrying a firearm during or in relation to a crime of violence, 18 U.S.C. § 924(c)(1)), *see* Joint Appendix ("J.A".) at 1229-30. Anthony was convicted of Counts 1 and 2 (RICO conspiracy to collect an illegal debt), 6 (conspiracy to interfere with commerce by extortion), 13, 20, 23, 24 (aiding and abetting interference with commerce by extortion), 21 (aiding and abetting attempted interference with commerce by extortion), and 18 (obstruction of justice), *see* J.A. at 1156-57. Paul was sentenced to ninety-seven months' imprisonment plus sixty months to run consecutively based

on the firearm counts; Anthony was sentenced to fifty-one months' imprisonment.[1]

Paul and Anthony then appealed their convictions and sentences to this court. We vacated both defendants' convictions, holding that the district court erred in not holding a *Remmer* hearing[2] to determine whether the jury verdict had been tainted by an attempted act of jury tampering. *See Corrado I*, 227 F.3d at 537; *Corrado II*, 2000 WL 1290343, at *1. We also instructed that, if the district court reinstated the Corrados' convictions, the district court should then resentence the Corrados. With respect to Paul's sentence, we held that the district court failed to comply with the requirements of Federal Rule of Criminal Procedure 32(c)(1), which requires a sentencing court to make adequate findings of fact in sentencing. *See Corrado I*, 227 F.3d at 540. Instead, we concluded that the district court had "either summarily adopted the findings of the presentence report or simply declared that the enhancement in question was supported by a preponderance of the evidence." *Id.*

In addition, the government appealed Anthony's sentence. We held that the district court erred because, given Anthony's conviction based on the Hobbs Act conspiracy and substantive extortion charges, the district court had failed to enhance his sentence based on his supervisory role. Thus, we held that, on remand, Anthony Corrado's sentence should be enhanced by three levels pursuant to the United States Sentencing Guidelines ("U.S.S.G.") § 3B1.1(b) (1997). *See Corrado II*, 2000 WL 1290343, at *4. In addition, the district court was instructed to make factual findings with respect to whether the actions of Paul Corrado and Nove Tocco, which

---

[1] Because the district court relied on the 1997 version of the United States Sentencing Guidelines in sentencing Anthony and Paul, all references to the Guidelines and the Commentary to the Guidelines in this opinion are to the 1997 version.

[2] *See Remmer v. United States*, 347 U.S. 227 (1954).

Corrado's sentence, and **REMAND** that case for further proceedings consistent with this opinion.

for the criminality of the bookmakers there would be *no* offense of conviction involving Paul Corrado.").

The present case is distinguishable from *United States v. Dailey*, 24 F.3d 1323 (11th Cir. 1994), which Paul Corrado cites in his brief. In *Dailey*, the extortion at issue had been provoked because "Dailey's victim had defrauded him out of tens of thousands of dollars." *Id.* at 1328. There is no indication in this record that any of Paul Corrado's extortion victims had defrauded him or provoked the extortion in any way. Thus, he should not receive the benefit of this downward departure. *Cf. United States v. Bigelow*, 914 F.2d 966, 975 (7th Cir. 1990) ("Section 5K2.10 contemplates situations where the actions of the victim *provoke* the conduct of the offense. Here, the victim, . . . did not engage in the behavior contemplated by [that provision]. . . . [The victim] was at worst an unpleasant and untrustworthy person. This does not excuse beating him, nor the extortion of his funds.") (citations omitted), *cert. denied*, 498 U.S. 1121 (1991).

The same conclusion holds for the conspiracies to murder Harry "Taco" Bowman and Jesus Morales. Morales was a bookmaker who refused to pay any "street tax" to Paul and Nove. On appeal, Paul argues that the conspiracy to kill him was "mere talk," and that their driving by his business was merely to "scope it out." Appellant's Br. at 49-50. The record is clear, however, that Morales did not provoke the conspiracy to murder him. Paul has a much better argument with respect to Bowman, who was a rather dangerous figure. The record indicates, however, that the basis for the conspiracy to kill Bowman was based on the latter's theft of a dice game from the Tocco organization. *See* J.A. at 1237 (Sent'g Memo.). This is not a proper ground for a downward departure in the present case.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the Corrados' convictions and Paul's sentence, **VACATE** Anthony

---

triggered the specific offense characteristic enhancements found in U.S.S.G. §§ 2B3.2(b)(1), 2B3.2(b)(3)(A)(i), and 2B3.2(b)(2)), were reasonably foreseeable to Anthony Corrado. *See Corrado II*, 2000 WL 1290343 at *4.

On remand, the district court first held a *Remmer* hearing, which is discussed at length *infra*. The court concluded that the verdict had not been tainted by the attempted jury tampering and thus reinstated the Corrados' convictions. The court then resentenced the Corrados.

### A. Paul Corrado's Resentencing

Prior to resentencing, an evidentiary hearing was held at which Nove Tocco, another defendant in the RICO case, testified with respect to some of the factual findings remanded to the district court. Nove Tocco was called as a witness by the defense, although he is now cooperating with the government. On direct examination, Nove Tocco testified, among other things, (1) that he, rather than Paul, had recruited various individuals into their extortion scheme, and that Paul's role in the scheme declined over time; (2) that he did not see Paul with a handgun during the extortion of George Sophiea; and (3) that there had never been a plan to kidnap or murder Ramzi Yaldoo or Jesus Morales. These factual issues were relevant to the specific offense characteristics at issue in Paul's resentencing.

The district court then resentenced Paul to ninety-seven months' imprisonment plus sixty months to run consecutively. *See* J.A. at 1239 (Resentencing Mem.). In its written memorandum, the district court stated:

The Court of Appeals Decision remanding this case directed this court to make findings of facts supporting its conclusions with regard to the leadership roles of the defendant, the involvement of the defendant to conspiracy to murder Bowman, and the determination that the defendant was armed when he extorted money from George Sophiea.

Prior to sentencing, the defendant's attorney requested that the court also consider the fact that the defendant's only victims were, so the defendant argued, themselves engaged in criminal activity.

J.A. at 1232. The district court first found that the two-level adjustments based on Paul Corrado's leadership role, pursuant to U.S.S.G. § 3B1.1(c), were supported by trial testimony and the testimony of Nove Tocco at the resentencing hearing. In sum, the district court found that:

Defendant Corrado recruited John Jarjosa and Tom Lenhard to assist in the extortion of Ramzi Yaldoo. Defendant Corrado also recruited John Jarjosa to assist in the extortion of money from George Yatooma and Sam Martin. Paul Corrado, along with Nove Tocco, utilized Peter Jack Corrado and Peter Tocco to assist them in the extortion of money from George Sophiea. The court finds all of these 3B1.1(c) increases in offense level are supported by a preponderance of the evidence.

J.A. at 1232-33. This conclusion was followed by a discussion of specific findings with respect to each enhancement.

The district court then found, by a preponderance of the evidence, that Paul Corrado participated in a conspiracy to murder Harry "Taco" Bowman, the president of the Outlaws Motorcycle Club; that Paul Corrado was armed during the extortion of George Sophiea; and that "the fact that the only victims of the defendant's criminal activities were themselves engaged in criminal activity as bookmakers" was not an appropriate basis for a downward departure pursuant to the Sentencing Guidelines, J.A. at 1238.

## B. Anthony Corrado's Resentencing

At resentencing, the district court sentenced Anthony Corrado to seventy months' imprisonment. With respect to the Count 1 RICO conspiracy, the district court concluded

demand was to be made. Based on Panaro's and Cino's reputations as members of an organized crime family, the district court did not clearly err by concluding that their plan to be present when the demand was made on Blitzstein constituted an agreement to make an implicit threat of bodily injury . . . if he refused to accede to the demand."). *See also United States v. DiSalvo*, 34 F.3d 1204, 1213 (3d Cir. 1994) (holding that implied threat could be found where mafioso's reputation, as established from his own statements, "relieved him from any necessity of utilizing express threats"); *United States v. Zannino*, 895 F.2d 1, 11 (1st Cir.) (holding, on sufficiency of the evidence in conviction for loan sharking, that "[e]vidence of a defendant's nexus to organized crime can be taken into account in evaluating [the] reasonableness of a debtor's fears," and that defendant's own statements "established that he was a Capo Regime in the Patriarca Family"), *cert. denied*, 494 U.S. 1082 (1990). For this reason, these findings are not clearly erroneous.

Finally, the district court did not err in declining to depart downward based on the criminality of Paul Corrado's extortion victims. Because the district court rejected this argument "on the law" without further elaboration, *see* J.A. at 1238, rather than on the facts, its decision is reviewable on appeal.

Section 5K2.10 provides for a downward departure based on the victim's wrongful conduct. It is limited, however, to situations where "the victim's wrongful conduct contributed significantly to provoking the offense behavior," U.S.S.G. § 5K2.10, and the considerations listed in the provision only reinforce this limitation. *See, e.g., id.* (b) ("any efforts by the defendant to prevent confrontation"); *id.* (c) ("the danger reasonably perceived by the defendant"). On the facts of the present case, we think that it is ridiculous for Paul Corrado to argue that the unlawful bookmaking of his victims *provoked* him to engage in extortion. Indeed, on appeal he does not argue provocation but instead that the illegal activities were a but-for cause of his activity. *See* Appellant's Br. at 47 ("But

an implied threat of bodily injury involved in the encounter. Monro testified, for example, that "[Paul Corrado] said, relax, if we were going to kill you, you'd be dead already." *See* J.A. at 1419. The district court did not err in concluding that this statement constituted an implied threat. *Cf.* U.S.S.G. § 2B3.2, applic. note 2 ("An ambiguous threat, such as 'pay up or else,' . . . ordinarily should be treated under this section.").

The record also indicates that Paul, Nove, and Sciarrotta took Monro "for a ride," J.A. at 1414, and that Monro was forced into the car for purposes of this "ride" against his will. The Sentencing Guidelines define "abducted" as meaning "that a victim was forced to accompany an offender to a different location. For example, a bank robber's forcing a bank teller from the bank into a getaway car would constitute an abduction." U.S.S.G. § 1B1.1, applic. note 1(a). Thus, the finding that Monro was "abducted" was not clearly erroneous. That Monro was not taken a great distance in the car, after being forced into it against his will, does not undermine this conclusion.

Similar evidence supports the district court's findings with respect to the threat enhancements for the Yaldoo and Wierzba counts. As the government argues, the relevant guideline provision states that "[e]ven if the threat does not in itself imply violence, the possibility of violence or serious adverse consequences may be inferred from *the circumstances of the threat or the reputation of the person making it.*" U.S.S.G. § 2B3.2(b)(1), applic. note 2 (emphasis added). The record indicates that Paul Corrado and Nove Tocco traded on the reputation of the Mafia in extorting their victims. Other courts have held that an extortionist's connection to organized crime can establish the existence of an implied threat. *See United States v. Panaro*, 266 F.3d 939, 953-54 (9th Cir. 2001) ("The record reflects that Panaro, Cino and the other conspirators repeatedly reassured DeLuca that Blitzstein would capitulate to the demand that Blitzstein relinquish his interests in the auto shop and loansharking businesses, and he would do that because of the conspirators' presence when the

that Anthony should be held responsible for only one of the six underlying racketeering activities alleged in the indictment, obstruction of justice, charged in Overt Act 22 of Count 1 and Count 18. *See* J.A. at 1202.[3] The district court declined to hold Anthony responsible, under the RICO count, for, inter alia, the extortion conspiracy and the substantive acts of extortion, finding these extortion activities independent of the larger RICO conspiracy.

Next, in calculating Anthony's sentence on Count 6, the extortion conspiracy charge, the district court included as underlying acts the five substantive extortion counts for which Anthony was convicted. *See* J.A. at 1197 (Sophiea), 1199 (Yaldoo), 1200 (Yatooma), 1201 (Martin and Abraham).[4] With respect to the four substantive extortion counts for which Anthony was not convicted, the district court concluded that "[n]o evidence[] tie[d] Anthony Corrado to the[ ] acts" involved in the Monro, Wierzba, Morales, and Johns extortions, J.A. at 1192 (Monro), 1193 (Wierzba), 1195 (Morales), 1196 (Johns), and thus that these extortions did not constitute underlying acts for sentencing on the extortion conspiracy count. In addition, the district court concluded that "[w]ith respect to the specific offense characteristics for use of threats, possession of a firearm, discharge of a firearm, threat of death, abduction, and amount of loss, . . . Anthony

---

[3]As we noted above, Anthony was actually convicted of Count 18, obstruction of justice in violation of 18 U.S.C. § 1503 and 18 U.S.C. § 2. However, the district court did not independently sentence Anthony on this Count; the court just included Count 18 as relevant conduct in its calculation of Anthony's Count 1 RICO conspiracy offense level. Because neither the government nor the defendant appeals this treatment of Count 18, we do not address it.

[4]The district court stated in regard to the substantive counts of extortion that "[f]or purposes of calculating the guidelines these five substantive counts will be merged into Count 6 to avoid double counting." J.A. at 1189. Because neither the government nor the defendant appeals this "merger" of Counts 13, 20, 21, 23, and 24 into Count 6, we do not address it.

Corrado could not have foreseen any of the specific characteristics of the extortion of Monro, Wierzba, Morales, Johns, Yaldoo, Sophiea, Yatooma, Martin and Abraham, and is not to be held accountable for those characteristics." J.A. at 1201-02.

The district court calculated an offense level of 25 for Count 6. It reached this level by first calculating the offense level for each substantive extortion count. Pursuant to U.S.S.G. § 2B3.2(a), the base offense level for violations of the Hobbs Act is 18; with the three-level enhancement under U.S.S.G. § 3B1.1(b) that this court mandated on the first appeal to reflect Anthony's supervisory role, the district court determined that the offense level for each substantive extortion count was 21. Grouping the substantive extortion counts as required by U.S.S.G. § 3D1.2(b), the court then determined that Anthony's combined offense level for the extortion conspiracy was 25 under U.S.S.G. § 3D1.4.

The government and Anthony agreed that the offense level for the Count 2 RICO conspiracy should be 19. Based on its conclusions and findings regarding Anthony's appropriate offense level for Counts 1, 2 and 6, the district court calculated a total offense level of 27 under the multiple count provisions of U.S.S.G. § 3D1.4. Combined with Anthony's Criminal History Category of I, the guidelines range was seventy to eighty-seven months' imprisonment. After declining to depart downward on three separate grounds (Anthony's health, his wife's health, and the government's culpability in damaging his health, which is discussed *infra*), the district court sentenced Anthony to the low end of the applicable range, seventy months' imprisonment.

Nove Tocco and Paul differently on this dimension. But it is the district court, rather than the probation department, that is charged with making the relevant findings of fact. The district court found this fact, and that finding is not clearly erroneous.

Paul next argues that the district court should have revised its finding with respect to the Monro incident based on Nove Tocco's testimony at resentencing. At issue is the applicability of the enhancements pursuant to U.S.S.G. § 2B3.2(b)(1), based on "an express or implied threat of death, bodily injury, or kidnapping," and U.S.S.G. § 2B3.2(b)(5)(A), because Monro was abducted, i.e., forced into the extortionists' automobile and taken from the scene of the encounter against his will. In making this argument, Paul again relies heavily on Nove Tocco's testimony at resentencing. The district court clearly discounted Nove's description of the relevant encounter. For example, Nove testified that he did not strike Monro:

Q: Did you restrain [Monro] or go after him or chase him?
A: Didn't have to. He, I don't know what happened. I don't know how he fell. He fell. He either ran into the back of his own car or he slipped. I don't know what occurred that night. I know I did not hit him and he was down on the ground. I picked him up.
Q: And did he try to get away?
A: No, not when I picked him up.

J.A. at 1940. Thus, at resentencing Nove Tocco testified that Monro "fell," that Monro ended up on the ground by either running into his own car or slipping. He then stated that "I don't know what occurred that night." This testimony seems less than credible, even on the "cold" record.

At trial, Monro testified to a physical altercation with Paul, Nove, and John Sciarrotta. *See* J.A. at 1415-16. The transcript supports the conclusion that there was, at minimum,

the extortion at issue. *See* J.A. at 1961. We are unable to conclude that this finding is clearly erroneous.

Moreover, the evidence adduced by Paul at resentencing does not compel the conclusion that the district court's factual finding on this point was clearly erroneous. First, Paul argues that Sophiea did not observe the firearm and that this fact indicates that Paul did not possess a firearm during the Sophiea extortion. No one has ever alleged, however, that the firearm was brandished or displayed during the events in question, only that it was possessed. Thus, the mere fact that Sophiea did not see the firearm does not compel the contrary conclusion. Second, Paul called Nove Tocco as a witness at resentencing, who testified that Paul did not possess a firearm during the events in question. As a longtime friend of Paul, his testimony may not have been terribly credible on this point. The district court may have chosen to discount this testimony for this reason. Nove Tocco's credibility as a witness at resentencing is further discussed *infra*.

Paul next argues that the evidence does not support the court's finding that he was a leader in the Hobbs Act conspiracy, a finding that resulted in a two-level increase pursuant to U.S.S.G. § 3B1.1(c). Given the proof at trial, however, this finding was not clearly erroneous. On appeal, Paul argues that "[t]he government's trial proofs . . . never really demonstrated the precise relationship between [Paul] Corrado and [Nove] Tocco or the others." Appellant's Br. (Paul) at 32. That evidence, however, supports the conclusion that Paul and Nove Tocco started the extortion scheme, as "partners," and that they carried out numerous acts of extortion together and in conjunction with others recruited into the conspiracy. Paul's argument that Nove was *more* involved, that it was Nove who recruited various individuals into the conspiracy, does not alter the fact that Paul was a leader of the scheme. In support of this argument, Paul argues that the district court instructed the probation officer preparing the presentencing report to add the two-level increase and that the probation officer had initially treated

## II.  ANALYSIS

### A.  *Remmer* Hearing

In the first appeal, we remanded for a *Remmer* hearing,[5] providing specific instructions to the district court with respect to the nature of that hearing on remand:

> At this hearing, the defendants should be accorded the opportunity to question the jurors individually and under oath about the extent of their interaction, if any, with Kennedy. The defendants should also be permitted to investigate the impact, if any, of the news reports describing Shabazz's arrest that were issued on the weekend before the jury began its deliberations.

*Corrado I*, 227 F.3d at 537 (citation omitted).

On remand, defense counsel submitted a list of eleven areas that they believed should be explored at the *Remmer* hearing:

> 1. About any discussion prior to deliberation about the nature and quality of the evidence, including identifying all of those persons they spoke with, including, but not limited to, all the jurors.
> 2. The substance of all such discussions and their feelings concerning those conversations.
> 3. Whether they read any newspaper articles, watched any media shows, or listened to any news reports which involved the trial;
> a. Whether they regularly read the "Oakland Press" or "Macomb Daily."

---

[5] For a description of the attempted jury tampering, by a third-party, Khalid Shabazz, *see Corrado I*, 227 F.3d at 533-35. After Shabazz approached Paul, the latter went to the authorities and assisted in the arrest and conviction of Shabazz. Shabazz was acquainted with a juror in the case, juror Edward Kennedy, and apparently thought that he could act as an intermediary between the defendants in the case and Kennedy. None of the defendants were involved in any way with Shabazz's efforts.

4.   Whether they read, heard, or were told anything about the arrest of Khalid Shabazz or anything about any impropriety concerning the jury.   The nature and substance of what they heard, identity of anyone they discussed it with, as well as the substance of those conversations.

5.   Whether they read, observed, or heard anything about the two particular articles in the Oakland Press and Macomb Daily.

6.   What discussions each juror had with, or in the presence of, Edward Kennedy in a van ride or elsewhere, regarding the "problem with a jury . . . [involving] some [Muslim] guy."

7.   What they heard prior to or during deliberation concerning the arrest of Shabazz, the arrest of Paul Corrado, the subject of jury tampering, the subject of juror misconduct; what discussions they had, if any; and the identity of any other person or juror who mentioned this subject.

8.   What discussion any juror had about Paul Corrado or any other defendant which did not relate to any testimony or exhibit.

9.   Why juror Seltenright felt constrained to . . . stay up with a gun in fear after [an investigator] attempted an interview.

. . . .

. . . .

10.   What discussion, if any, there was amongst the jurors or with any third party following the three questions put to them by the Court concerning that inquiry or the perception of what may have been taking place.

11.   Whether there was any mention of the movie "The Juror" . . . or any similar type of movie, book, TV show, etc.

J.A. at 1013-14.   The government objected to items 1-3 and 7-11, arguing that these questions went "far beyond what was ordered by the Court of Appeals and are in violation of the

he argues that the district court erred in concluding, as a matter of law, that the fact of the criminal involvement of his victims was not a ground for a downward departure.

Paul first argues that the district court erred in finding that he possessed a firearm during the extortion of Sophiea; this finding resulted in a five-level increase pursuant to U.S.S.G. § 2B3.2(b)(3)(A)(iii).   He argues that Sophiea's grand jury testimony does not support this finding, that Nove Tocco's testimony at the resentencing hearing undermines this finding, and that "[o]ther than the rifle shooting of Ramzi Yaldoo's window, *no* firearms were possessed during any contact with any bookmaker."   Appellant's Br. (Paul) at 25-26 (footnote omitted).   However, Paul's attorney stipulated at trial to a government surveillance report that included the following statement: "Defendant Paul Corrado was observed once again opening the trunk of the car and he appeared to remove a gun from the waist band of his pants and place it in the trunk." J.A. at 1533-C.   The district court held that this stipulation bound Paul for sentencing purposes and that, based on the stipulation, it found that Paul had possessed a firearm during

---

district court failed to provide sufficient findings of fact with respect to the contested sentencing factors, specifically "the leadership role of the defendants, the finding of a conspiracy to murder Bowman, and the determination that Corrado was armed at the time that the defendants extorted money from Sophiea." *See Corrado I*, 227 F.3d at 540.   These factors were contested because they were the issues raised by Paul and Nove Tocco on their first appeal. *See id.*   On the first appeal, this court remanded because, in stating its findings on these issues, the district court "either summarily adopted the findings of the presentence report or simply declared that the enhancement in question was supported by a preponderance of the evidence." *Id.*   On remand, the district court provided additional factual findings.
     We must first decide, then, whether the district court's findings of fact with respect to these issues were adequate to support its conclusions in resentencing Paul.   We conclude that the district court's factual findings are adequate to enable appellate review of the district court's findings with respect to Paul's sentence.   Thus, we will consider whether the challenged findings are clearly erroneous.

characteristics associated with particular acts of extortion committed by his coconspirators, pursuant to U.S.S.G. §§ 1B1.3(a)(1)(B) (relevant conduct), 2B3.2(b)(1), 2B3.2(b)(3)(A)(i), and 2B3.2(b)(2) (specific offense characteristics). *See Corrado II*, 2000 WL 1290343, at *4-5. At resentencing, the district court found that none of these specific offense characteristics were reasonably foreseeable to Anthony and thus did not enhance his sentence on the extortion conspiracy on the basis of any of these characteristics. The district court made this finding in one sentence. *See* J.A. at 1201-02. On this new remand, we again instruct the district court to make adequate factual findings regarding the specific offense characteristics that the government alleges apply to the substantive acts of extortion for which Anthony was convicted. For purposes of appellate review, the district court must provide some explanation for *why* these acts were or were not reasonably foreseeable to Anthony. *See* Fed. R. Crim. P. 32(c)(1); *Corrado I*, 227 F.3d at 540-41.

### C. Paul Corrado

Paul Corrado also raises a number of arguments with respect to his sentence. First, he argues that the district court erred in finding that he possessed a handgun during the extortion of George Sophiea. Second, he argues that district court erred in finding that he had acted in a leadership role in the extortion scheme. Third, he argues that the district court erred in not reconsidering whether Robert Monro, an extortion victim, had been threatened, physically assaulted, and abducted, based on the testimony of Nove Tocco at resentencing. Fourth, he argues that Nove Tocco's testimony also called into question adjustments imposed with respect to the extortion of George Wierzba and Ramzi Yaldoo.[13] Fifth,

---

[13] Generally speaking, Paul's first four arguments follow from a more general complaint — namely, that, on remand, the district court failed to obey this court's mandate to make factual findings sufficient for appellate review. In remanding this case to the district court, we concluded that the

Federal Rules of Evidence." J.A. at 1000. The government cited Federal Rule of Evidence 606(b).[6]

The *Remmer* hearing was held on October 10, 2000. The district court first ruled on two important threshold matters: (1) that the *Remmer* hearing would be held in open court, rather than *in camera*; and (2) that the questions to be asked by counsel would "be strictly limited to . . . whether there was any interaction with alternate juror Kennedy concerning . . . the approach made to him by Mr. Shabazz and the questions concerning whether news reports or other information concerning Mr. Shabazz's arrest and Defendant Corrado's involvement in that arrest came to the attention of any of the jurors." J.A. at 2033. The court continued: "If and only if the former juror testifies that there was some interaction related to the Shabazz contact . . . or that the arrest and the events surrounding the arrest of Mr. Shabazz came to the attention of any jurors, then the Court will allow follow-up questions concerning the impact if any of such conduct, interaction or information." J.A. at 2034.

The district court proposed to ask each juror the following questions, prior to allowing the government and defense counsel to ask their questions:

At any time prior to or during your deliberations . . . did you hear anything from alternate juror Edward

---

[6] That rule provides, in relevant part:
Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.
Fed. R. Evid. 606(b).

Kennedy or any other person about someone desiring, through Mr. Kennedy or otherwise, to affect the deliberations of the jury in any way?

If there is any kind of an affirmative answer or an uncertain answer to that, if you did, what did you hear and from whom?

And at any time prior to deliberations or during your deliberations did you, through newspapers, television or any other media, hear about the arrest of a person Khalid Shabazz or anybody for attempting jury tampering, specifically, did you hear that the Defendant Paul Corrado was involved in the events surrounding the arrest of Mr. Shabazz?

If the answer to the first question is yes . . . did you read or hear at any time prior to or during deliberations anything printed in either of the Oakland Press or the Macomb Daily concerning the events surrounding the arrest of Mr. Shabazz?

J.A. at 2037-38. Defense counsel objected, specifically noting that many of their eleven subject areas had been eliminated. The district court explained that, while it had not ruled specifically on the eleven areas, it would pursue these lines of questions as those permitted by law and required under our mandate. The district court also noted that, "I don't think anything else is relevant." J.A. at 2044.

After additional objections were raised by defense counsel and discussed, the district court proceeded to call and question, under oath, all twelve deliberating jurors and the six alternate jurors, including alternate juror Edward Kennedy. The government and defense counsel were also given an opportunity to ask questions within the scope allowed by the court. Jurors 87, 178, 55, 58, 12, 157, 7, 41, and 122 answered the court's questions in the negative; these jurors also testified, in response to defense counsel's questions, that they did not recall discussing the jury tampering incident or news accounts of it with Kennedy or anyone else.

district court held Anthony responsible only for those five substantive counts of extortion for which he was convicted — Counts 13 (Yaldoo), 20 (Yatooma), 23 (Abraham), 24 (Sophiea), and 21 (Martin) — rather than for all of the extortion victims (nine) alleged in Count 6 and the specific counts of which he was not convicted. The district court held that, as a trier of fact, he would not convict Anthony of conspiring to commit those four offenses for which he was not convicted. *See* J.A. at 1192 ( Count 10 — Monro), 1193-94 (Count 12 — Wierzba), 1195 (Count 11 — Morales), 1196 (Count 17 — Johns).[12]

In previously remanding this case, we also instructed the district court to make factual findings with respect to whether Anthony Corrado should be accountable for specific offense

offense(s) [were] the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense.

U.S.S.G. § 1B1.2, commentary, applic. note 5. This note only applies under U.S.S.G. § 1B1.2(d), which states that "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." U.S.S.G. § 1B1.2(d).

[12]The government does not argue in its brief on appeal that the district court should have held Anthony responsible for the four substantive acts of extortion of which he was not convicted for the purposes of calculating his Count 6 Hobbs Act conspiracy base offense level; however, the government's chart, *see* Appellee's Br. at 63-64, suggests that Anthony should be held responsible for those acts. Arguments not developed in briefs on appeal are deemed waived by this court, however, and we thus do not address whether the district court properly held Anthony responsible for only five substantive acts of extortion in its calculation of Anthony's base offense level for the extortion conspiracy. *See United States v. Layne*, 192 F.3d 556, 566-67 (6th Cir. 1999), *cert. denied*, 529 U.S. 1029 (2000) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" (quotation omitted)).

On remand, however, the district court need not revisit its findings regarding whether the Frontier Hotel and Edgewater Hotel counts and the conspiracy to murder Harry "Taco" Bowman constitute relevant conduct for purposes of sentencing Anthony under Count 1. We conclude that the district court's findings with respect to these issues are adequate for appellate review and that they are not clearly erroneous. The evidence produced by the government to connect Anthony with these incidents was not sufficient to support a finding either that he was involved in any illegality in association with them or that any such illegality was reasonably foreseeable to him. A contrary conclusion is not dictated by the jury's guilty verdict on Count 1, in contrast to the Hobbs Act conspiracy and substantive counts.[10]

### b. Count 6 Hobbs Act Conspiracy

At resentencing, the district court considered whether the substantive acts of extortion should be used to calculate Anthony's base offense level for the Hobbs Act conspiracy, applying the higher standard for multiple-object conspiracies found in application note 5 to U.S.S.G. § 1B1.2.[11] The

---

[10] In sum, for the Count 1 RICO conspiracy conviction, Anthony Corrado must be held responsible for: (1) the extortion conspiracy; and (2) the substantive acts of extortion for which he was convicted, in addition to the obstruction of justice. At minimum, this results in a base offense level of 26 when the offense levels are combined pursuant to U.S.S.G. § 3D1.4. The obstruction of justice count warrants an offense level of at least 12, *see* J.A. at 1202-03 (noting that offense level for obstruction of justice count could either be 12 or 18), the extortion conspiracy warrants an offense level of 21 (a base offense level of 18 pursuant to U.S.S.G. § 2B3.2(a) and a three-level aggravating role enhancement pursuant to U.S.S.G. § 3B1.1(b)), and each substantive count of extortion also warrants an offense level of at least 21 (a base offense level of 18 pursuant to U.S.S.G. § 2B3.2(a) and a three-level aggravating role enhancement pursuant to U.S.S.G. § 3B1.1(b)).

[11] That provision states, in relevant part:
Particular care must be taken in applying subsection (d) because there are cases in which the verdict . . . does not establish which

Juror 108 had suffered a *grand mal* seizure that caused memory loss; she testified that she did not recall any incidents or discussions regarding the Shabazz incident.

Juror 90 testified that he/she heard about the Shabazz incident, but he/she was not certain whether he/she heard about it before or after the trial concluded. Juror 90 had a great deal of difficulty remembering specifics. He/she did testify, however, that his/her verdict was not affected by any such information but was instead "definitely based on . . . what we heard during trial as far as . . . all the evidence." J.A. at 2099. Juror 143 recalled "something about somebody in a restaurant at one time," in response to the court's question regarding whether the juror had heard anything about Shabazz's arrest. J.A. at 2126. As with Juror 90, however, Juror 143 testified that this information did not impact his/her impartiality.

Jurors 90, 12, and 143 all testified that, at about the same time, the absence of another juror, alternate juror 130, "Myron" — who was, as it turns out, unable to attend the trial because of illness — caused them to wonder about events surrounding the trial. The district court, however, ruled that this line of questioning by defense counsel, i.e., the juror's absence and speculation related to it, was irrelevant to the purposes of the *Remmer* hearing.

The alternate jurors were questioned by counsel but were not asked the preliminary questions by the court. Alternate jurors 166 and 130 testified that they had heard nothing about these matters. Alternate juror 147 testified that he/she had heard of the Shabazz arrest, but that he/she had not associated that information with the trial. Alternate juror 126 also testified to having heard about the news article on possible jury tampering, but he/she also testified that the discussion was limited to the article and not to whether individual jurors had themselves been contacted. Similarly, alternate juror 151 testified that he suffered from anxiety because the trial involved alleged participants in organized crime.

Alternate juror Kennedy (alternate juror 62) was questioned last. He testified that he had never approached any other jurors with respect to Shabazz's offer and that he did not come forward with his information when the district judge asked the jury the three questions at trial because he knew Shabazz only by the nickname, "D." Kennedy testified to overhearing jurors discuss the Shabazz incident in the van bringing the jurors to the courthouse, but one of the jurors he identified as having discussed the incident was Myron, the juror who was absent at that time because of illness. The other juror identified by Kennedy as participating in this discussion was Juror 7, "Suzanne."

At the conclusion of the hearing, the district court reinstated the Corrados' convictions, holding "that there is a total absence of any credible evidence that the work of the jury in this case was in any way tainted by the events or contacts that . . . we . . . were told to look into by the Sixth Circuit." J.A. at 2203.

### 1. Standard of Review

We review the district court's decision on juror misconduct or its determination of prejudice for abuse of discretion. *See United States v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999) (misconduct calling into question jury impartiality); *United States v. Branham*, 97 F.3d 835, 855 (6th Cir 1996) (determination of prejudice). The defendants bear the burden of showing prejudice. *Branham*, 97 F.3d at 855. "[U]nder no circumstance will prejudice be presumed." *Id. See also United States v. Pennell*, 737 F.2d 521, 532 (6th Cir. 1984) ("[T]he burden of proof rests upon a defendant to demonstrate that unauthorized communications with jurors resulted in actual partiality. Prejudice is not to be presumed."), *cert. denied*, 469 U.S. 1158 (1985).

### 2. Application

On appeal, Paul Corrado argues that the district court erred because (1) the faulty memories of jurors, due in large part to

RICO conspiracy in the present case. Forfeiture is a mandatory aspect of RICO sentencing, with the members of the criminal enterprise jointly and severally liable for the proceeds of the entire enterprise. *See Corrado III*, 227 F.3d at 550-51. In the *Corrado III* forfeiture case, we held that the district court erred in finding that the proceeds of the "street tax" scheme involved in the Hobbs Act counts were not attributable to "the entire criminal enterprise," and thus "that the district court committed clear error in failing to hold Jack Tocco and Giacalone jointly and severally liable for forfeiture of the street tax proceeds." *Id.* at 555. More recently, in the *Corrado IV* forfeiture case, we held that "the evidence showed that Anthony Corrado was a member of the conspiratorial enterprise that empowered the collection of the street taxes," and thus that Anthony was jointly and severally liable, pursuant to mandatory RICO forfeiture, for the proceeds of the street tax scheme. *Corrado IV*, 286 F.3d at 938-39.

Because we conclude that the extortion conspiracy and the Count 1 RICO conspiracy were not independent, we hold that it was clear error for the district court, in resentencing Anthony, to find that the street tax conspiracy and the substantive acts of extortion involved in it were not "underlying racketeering activity" pursuant to U.S.S.G. § 2E1.1(a)(2) for the purpose of calculating Anthony's base offense level for Count 1. Remand is thus necessary so that the district court can recalculate Anthony's sentence to include, at minimum, the Hobbs Act conspiracy and the specific acts of extortion for which Anthony was convicted as relevant conduct under the Count 1 RICO conspiracy conviction. In addition, the district court must reconsider the substantive acts of extortion charged in the indictment but for which Anthony was *not* convicted to determine whether those acts of extortion were relevant conduct for purposes of the RICO conspiracy charged in Count 1, i.e., whether these acts of Paul and Nove Tocco were "reasonably foreseeable" and "in furtherance of the jointly undertaken criminal activity," U.S.S.G. § 1B1.3(a)(1)(B), i.e., the RICO conspiracy.

It is at least possible, however, that Anthony's participation in the extortion conspiracy and his commission of substantive acts of extortion were independent of his participation in the Count 1 RICO conspiracy.[9]   The facts of this case and our prior opinions in this case, though, require a conclusion that the extortion conspiracy was not independent of the overarching RICO conspiracy charged in Count 1. First, the same parties were involved in both conspiracies — in the same roles. Evidence established that, prior to starting up their "business," Paul and Nove Tocco received permission from the "boss" of the Detroit family, Jack Tocco; that Anthony, as a "capo" in that family, supervised Paul and Nove Tocco in the "street tax" scheme; and that Anthony took steps, throughout the period in which Paul and Nove Tocco were extorting bookmakers in the Detroit metropolitan area, to rein in his subordinates to keep them from attracting the unwanted attention of law enforcement on the overarching RICO conspiracy. In addition, we mandated a three-level increase in the offense levels for the Hobbs Act conspiracy and substantive counts based on Anthony's supervisory role in the Hobbs Act conspiracy. *See Corrado II*, 2000 WL 1290343, at *4.

Second, we have previously held, in the forfeiture cases, *Corrado III*, 227 F.3d at 554-55, and *Corrado IV*, 286 F.3d at 938-39, that it was clear error for the district court to conclude that the Hobbs Act conspiracy was not part of the overarching

---

[9]A criminal conviction on a count regarding another conspiracy in addition to a criminal conviction on a RICO-conspiracy count does not *necessarily* require that the district court find the defendant accountable for the non-RICO conspiracy as relevant conduct for the purpose of determining the base offense level for the RICO conspiracy. *See* U.S.S.G. § 1B1.3, commentary, applic. note 1 ("The principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability. Under subsections (a)(1) and (a)(2), the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator.").

the passage of time, rendered the *Remmer* hearing on remand inadequate; (2) the district court unduly limited defense counsel's questioning of jurors; and (3) the district court should have presumed bias because the jurors were obviously less than candid at the hearing. Anthony Corrado argues that the district court erred because (1) there is at least a reasonable possibility that extrinsic evidence affected the jury's verdict in this case; (2) the district court unduly limited defense counsel's ability to question jurors; (3) and the proceedings were held in open court rather than *in camera*, which caused jurors to be less than candid regarding bias and/or the effect of extrinsic evidence on their verdict.

The defendants had the burden of demonstrating at the *Remmer* hearing that they were prejudiced by the jury-tampering incident and/or news accounts of that incident. We agree with the district court that the defendants failed to produce evidence sufficient to establish that the jury's verdict had been tainted by this extrinsic information.    The defendants' arguments that this court should presume that the jury's verdict in the present case was tainted are contrary to binding precedent and thus must be rejected. *See United States v. Orlando*, 281 F.3d 586, 597-98 (6th Cir. 2002) (reaffirming that the burden is on the party claiming juror bias and that a reasonable possibility of taint is insufficient to carry that burden).

Similarly, both Corrados argue that the jurors' testimony at the *Remmer* hearing was less than candid and that therefore the district court erred in reinstating their convictions. We have previously held, however, that a juror's testimony regarding his or her own impartiality should not be treated as "'inherently suspect.'" *Pennell*, 737 F.2d at 533 (quoting *Smith v. Phillips*, 455 U.S. 209, 217 n.7 (1982)). *See also United States v. Zelinka*, 862 F.2d 92, 96 (6th Cir. 1988) ("[J]uror testimony at the '*Remmer* hearing' is not inherently suspect."). In *Pennell*, we explicitly held "that if a district court views juror assurances of continued impartiality to be credible, the court may rely upon such assurances in deciding

whether a defendant has satisfied the burden of proving actual prejudice." 737 F.2d at 533.

In *Pennell*, five jurors had received threatening late-night, anonymous telephone calls regarding their verdict in the case; these jurors communicated the content of these telephone calls first to their fellow jurors, then to the court. *See id.* at 529. Upon learning this information, the court questioned the five jurors individually and out of the presence of the other jurors. Each of the five jurors stated that his or her impartiality had not been compromised and that he or she could continue to function as a juror. Other jurors noted, however, that Juror Saveski seemed particularly shaken by the incident. When the court questioned Juror Saveski, she "stated four times in response to different questions that the telephone call had not affected her impartiality or her ability to decide the case on the basis of the testimony and exhibits." *Id.* The court then asked questions regarding impartiality and ability to render a verdict to the entire jury. When no juror expressed doubt with respect to these issues, the court ordered the jury to continue its deliberations. *See id.* at 529-30.

Shortly thereafter, however, the court received a note from the jury notifying it that another juror, Juror Lorenz, believed that the telephone calls would influence her decision in the case.

The court immediately summoned Juror Lorenz, who had not received a telephone call, back to the courtroom. In response to questions, Lorenz stated that listening to the other jurors had made her nervous and that she did not wish to receive a telephone call. Nevertheless, she twice indicated that the calls received by the others would not affect her verdict. In response to additional questioning, Lorenz stated three times that the calls would not affect her deliberations and further stated that she could still abide by her juror's oath. The court then asked Lorenz if she were concerned about possible safety, to which Lorenz responded by nodding her head. When asked

Indeed, the court can only conclude from the lengthy consideration that it has given all the evidence related to the relationship(s) and interactions between Nove Tocco, Paul Corrado, on the one hand, and Jack Tocco and Anthony Corrado, on the other, that Nove Tocco and Paul Corrado carried out their "street tax" extortions in spite of the resistance and displeasure expressed consistently and in various ways by the older members of the Count 1 RICO conspiracy.

J.A. at 1176-77.[8] This statement seems entirely to ignore the fact that Anthony was *convicted* of the extortion conspiracy. *See Corrado II*, 2000 WL 1290343, at *4 (noting that a sentencing court cannot "ignor[e] conduct of which a defendant has been found guilty beyond a reasonable doubt"). Inasmuch as conspiracy to extort in violation of the Hobbs Act was listed as a predicate act in the indictment, *see* J.A. at 175 (Indictment), we believe that Anthony's conviction on the extortion conspiracy count serves the function of a special verdict on that predicate act.

---

[8]The district court discussed whether to include the Hobbs Act conspiracy as relevant conduct for the purposes of calculating Anthony's Count 1 RICO conspiracy offense level in terms of "merg[ing]" Count 6 into Count 1. J.A. at 1160. We are troubled by this terminology. District courts may "merge" convictions (by vacating duplicitous or multiplicitous convictions) after a jury verdict if the court finds that the convictions are duplicitous or multiplicitous and therefore in violation of the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution. *United States v. Throneburg*, 921 F.2d 654, 657 (6th Cir. 1990); *see also Ball v. United States*, 470 U.S. 856 (1985). However, Anthony's conviction under RICO and his conviction under the Hobbs Act are not duplicitous; we have long maintained that the imposition of consecutive sentences for violations of RICO and its accompanying predicate offenses does not violate the Double Jeopardy Clause. *See United States v. Sutton*, 700 F.2d 1078, 1081 (6th Cir. 1983). Had the district court concluded that the Hobbs Act conspiracy was relevant conduct for the purposes of calculating Anthony's offense level for the Count 1 RICO conspiracy conviction, the court still should have independently calculated his offense level for the Count 6 Hobbs Act conspiracy conviction.

We recognize that the jury in the present case rendered a general verdict and thus did not specify which of the predicate acts it found had been agreed to by Anthony and the other defendants. As we have previously held, however, the "other verdicts of the same jury may serve the function of a special verdict on the predicate acts, where those other verdicts necessarily required a finding that the RICO defendant had committed the predicate acts." *Callanan v. United States*, 881 F.2d 229, 234 (6th Cir. 1989), *cert. denied*, 494 U.S. 1083 (1990). Because both the extortion conspiracy and the substantive acts of extortion were predicate acts of the Count 1 RICO conspiracy, we conclude that the district court erred in this case by not including the extortion conspiracy and the substantive acts of extortion for which Anthony was convicted as "underlying racketeering activity" for the purpose of calculating Anthony's Count 1 RICO conspiracy offense level.

With regard to whether the extortion conspiracy and the substantive acts of extortion constituted relevant conduct for Anthony's Count 1 RICO conspiracy base offense level, the district court stated at resentencing:

> The court, having considered all the evidence, listened to and observed all witnesses at trial, listened to hours of tape recordings almost entirely of conversations between Nove Tocco and Paul Corrado, been present at the testimony last year of Nove Tocco, all of which it views in context against the imperative fundament of Anthony Corrado's conviction on Counts 1, 2, 6, 13, 20, 21, 23 and 24 concludes and finds that the "street tax" extortions of Nove Tocco and Paul Corrado were indeed independent of the overall Count 1 RICO conspiracy of which Anthony Corrado was convicted and that therefore those extortionate acts of Nove Tocco and Paul Corrado are not relevant conduct for the purpose of offense level calculations as to Anthony Corrado under Count 1.

whether her nervousness would prevent her from continuing deliberations, Lorenz responded "I don't know."

*Id.* at 530. After another exchange, in which the court assured Lorenz that nothing would come of the telephone calls, the court concluded that Lorenz would be able to render an impartial verdict based on the evidence. The court further concluded that the entire jury would be able to render an impartial verdict. *See id.*

We held that the district court had not abused its discretion in denying the defendant's motion for a mistrial. *See id.* at 534. The district court had held the required *Remmer* hearing, at which "[t]he court thoroughly questioned the contacted jurors on an individual basis and concluded that their assertions of unimpaired impartiality were worthy of belief." *Id. Pennell* indicates that the district court's determination regarding the credibility of jurors' assurances should receive substantial deference on appeal. In that case, despite evidence in the record that at least two jurors experienced a great deal of anxiety as a result of the threatening telephone calls, we concluded that the defendant had not sustained his burden. The district court had questioned the jurors individually, and the jurors had given assurances to the court, albeit after some hesitation, that they could still be impartial. We held that the district court was within its discretion in concluding that these assurances were credible.

Given *Pennell*, we hold that the district court did not abuse its discretion in the present case. The district court questioned the jurors individually about the jury tampering incident and news coverage of it and determined that their negative responses to its questions were reliable. None of the deliberating jurors testified that their verdict was tainted by the jury tampering incident. Although the testimony of alternate juror Kennedy suggests that at least one juror (Suzanne) was less than completely honest in her testimony, Kennedy's own testimony is itself problematic. For example,

Kennedy recalled that Suzanne had discussed the jury tampering incident with Myron, but the record showed that Myron was not present on the day that Kennedy testified Suzanne discussed the issue with him. In addition, there is reason to discount Kennedy's credibility given his past actions in the present case, i.e., his silence when the district judge asked the jury about the Shabazz incident prior to deliberations.

That the proceeding was held in open court, as opposed to *in camera*, does not change our analysis. The defendants argued "that jurors would be more candid . . . if not forced to shed their anonymity by testifying in open court." Appellant's Br. (Anthony) at 5. The district court reasoned, however, that the jurors were familiar with the courtroom and that holding the proceeding *in camera* would make them uncomfortable, increase their anxiety level, and lead to less candor in their answers. Moreover, during the *Remmer* hearing the jurors were not identified by name but only by juror number, and thus steps were taken to protect their anonymity in open court. The district court thus held that "the presumption that all court business will be conducted in public" was not outweighed by any compelling interest. J.A. at 2031. Based on the facts of the present case, we cannot conclude that the district court erred in holding the *Remmer* hearing in open court. "Closed proceedings, although not absolutely precluded, must be rare and only for cause shown that outweighs the value of openness." *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 509 (1984). The openness of the *Remmer* hearing clearly advanced "the appearance of fairness so essential to public confidence in the system," *id.* at 508, in this high-profile case.

With respect to the effect of the passage of time, we think that jurors are likely to recall whether their verdict was tainted by extrinsic factors, even if they have trouble remembering the names of their fellow jurors, day-to-day happenings during the course of a lengthy trial, and the like. Thus, the mere passage of time is not sufficient to call into question the

is relevant to . . . participating in a criminal enterprise.") The issue in the present case, then, is whether the district court erred by not including the following as "underlying racketeering activity" for the purpose of calculating Anthony Corrado's offense level for Count 1: (1) the extortion conspiracy; (2) the substantive acts of extortion; (3) the conspiracy to murder Harry Bowman; and (4) activities related to the Frontier and Edgewater Hotels.

We note at the outset that in order to convict Anthony of the RICO conspiracy charged in Count 1, the jury necessarily had to find, beyond a reasonable doubt, that Anthony agreed to the commission of at least two RICO predicate acts. *See* 18 U.S.C. § 1961(5) ("'pattern of racketeering activity' requires at least two acts of racketeering activity"); *see also Salinas v. United States*, 522 U.S. 52, 66 (1997); *United States v. Joseph*, 781 F.2d 549, 554-55 (6th Cir. 1986). However, the district court found, by a preponderance of the evidence, that Anthony was responsible for only one "underlying racketeering offense," obstruction of justice, for the purpose of calculating Anthony's base offense level for the Count 1 RICO conspiracy pursuant to the relevant conduct provisions of U.S.S.G. § 1B1.3. Relevant conduct includes: (1) "all acts or omissions" that the defendant "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused"; and (2) "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity," that occurred during, in preparation for, or in the course of attempting to avoid detection or responsibility for the RICO conspiracy. U.S.S.G. § 1B1.3(a)(1)(A) & (B). RICO predicate acts, then, for which a defendant is convicted necessarily constitute relevant conduct for the purpose of calculating the defendant's base offense level for a RICO conspiracy conviction. The district court thus erred in sentencing Anthony by finding, by a preponderance of the evidence, that he was responsible for only one "underlying racketeering offense" where the jury found, beyond a reasonable doubt, that Anthony agreed to the commission of at least two RICO predicate acts.

and (2) in declining to enhance Anthony Corrado's Count 6 extortion conspiracy offense level because the acts of Nove Tocco and Paul Corrado triggering those enhancements were not reasonably foreseeable to Anthony Corrado.

We review de novo the sentencing court's interpretation of the Sentencing Guidelines and statutes, and we review for clear error its factual findings. *See, e.g., United States v. Swiney*, 203 F.3d 397, 401 (6th Cir.), *cert. denied*, 530 U.S. 1238, 1268 (2000). If the district court's factual findings are not clearly erroneous, this court reviews de novo "the determination that the conduct in question constituted relevant conduct." *United States v. Myers*, 123 F.3d 350, 364 (6th Cir.), *cert. denied*, 522 U.S. 1020 (1997). "Whether the criminal acts of others in a jointly undertaken criminal activity are reasonably foreseeable is a question of fact, reviewable only for clear error." *United States v. Canestraro*, 282 F.3d 427, 433 (6th Cir. 2002).

### a. Count 1 RICO Conspiracy

Section 2E1.1 governs sentencing for RICO conspiracy convictions. It provides that the base offense level for a RICO count is the greater of 19 or "the offense level applicable to the underlying racketeering activity."[7] In *Tocco*, we held that the test for determining whether conduct qualifies as an "underlying racketeering activity" for sentencing purposes is the relevant conduct test, i.e., that found in U.S.S.G. § 1B1.3. *See* 200 F.3d at 430. *See also Corrado I*, 227 F.3d at 542 ("[T]he underlying acts of racketeering in a RICO conspiracy are . . . simply conduct that

---

[7]The Introductory Commentary states: "The offense level usually will be determined by the offense level of the underlying conduct." Application Note 1 states: "Where there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction . . . ." Thus, the provision and commentary use three different constructions ("underlying racketeering activity," "underlying conduct," and "underlying offense") to refer to the same thing.

fairness of the hearing. With respect to both the passage of time as well as the juror with amnesia, we note that the party seeking to prove taint bears the burden in the *Remmer* hearing; to allow the passage of time, and the fading of memory, to enter the calculus would shift that burden to a considerable extent. The party with the burden, in effect, bears the risks of juror amnesia and faded memory because of the passage of time.

Both Anthony and Paul also argue that the district court inappropriately limited their ability to ask questions of the jurors at the hearing. To the extent the district court limited the asking of questions based on its determinations of relevance, we review for abuse of discretion. *See United States v. Nash*, 175 F.3d 429, 434 (6th Cir.), *cert. denied*, 528 U.S. 888 (1999). The district court clearly did not abuse its discretion in limiting defense counsel's ability to ask questions about the movie, "The Juror," or about the juror who slept with a handgun under his pillow *after* the conclusion of the trial. Similarly, we cannot conclude that the district court abused its discretion in limiting questions with respect to the conclusions the jurors drew from Myron's absence because of health problems. That Myron's absence coincided with the jury tampering incident does not make the juror's absence itself a source of juror bias or prejudice, and thus it was peripheral to the *Remmer* hearing, at best. The defense sought to make the *Remmer* hearing a full-scale inquiry into the jury's doubts and fears going into deliberation; the district court was within its discretion in preventing this.

Finally, Federal Rule of Evidence 606(b) limits the admissibility of juror testimony in a hearing such as this, and the district court correctly concluded that some of the areas that the defense proposed to explore are "off limits" under that rule. As we noted in *United States v. Gonzales*, 227 F.3d 520, 525 (6th Cir. 2000), "Rule 606(b) explicitly disqualifies juror testimony regarding jurors' mental processes in connection with deliberations." Thus, areas 1-3 and 8, quoted

*supra*, were not appropriate grounds for questions at the hearing, as they went to juror thought processes rather than the *influence* of the jury tampering incident. We hold that the district court appropriately limited discussion to conform with this rule.

## B. Anthony Corrado

Anthony raises one additional issue, and the government cross-appeals his sentence.

### 1. Downward Departure

Anthony appeals the district court's decision not to depart downward in sentencing him, based on the government's culpability for damaging his health in needlessly and (allegedly) vindictively transporting him from Rochester, Minnesota, to Detroit to testify in another case.

A district judge's refusal to depart downward is ordinarily unreviewable, but we may review the district court's decision if the district court was unaware of its discretion to depart downward. *See, e.g., United States v. Byrd*, 53 F.3d 144, 145 (6th Cir. 1995). The district court implicitly acknowledges its discretion to depart downward where it clearly finds on the facts in the record that the requested downward departure is unwarranted. Such a finding precludes appellate review of the district court's decision. *See United States v. Jones*, 102 F.3d 804, 809 (6th Cir. 1996); *see also United States v. Abdullah*, 162 F.3d 897, 905 (6th Cir. 1998) (holding that district court's decision was unreviewable where district court "entertained argument" and "clearly expressed recognition of his discretion to depart").

In the present case, the district court implicitly recognized its discretion to depart from the Guidelines by calling into question the factual basis of the defendant's motion. At the resentencing hearing, for example, the district court stated:

[Anthony's] counsel argues with great persuasive force that such mistreatment and its effects were clearly not contemplated by the drafters of the sentencing guidelines but are a special circumstance which a sentencing court should be able to take into consideration. Perhaps under the right circumstances, what counsel urges upon the Court should become part of our jurisprudence but not under these circumstances. First of all, the Court cannot conclude, based on Dr. Yee's testimony, that any maltreatment that Mr. Corrado may have suffered caused major and persistent damage to his health. The evidence is simply not conclusive on this point. Even if it were, there's no jurisprudentially satisfying record, other than the assertions of Mr. Corrado himself, that this maltreatment occurred and the Court cannot therefore find that it did. If such evidence were available, the Court would be confronted with another very difficult issue . . . when, if at all, should maltreatment of a prisoner be a basis for downward departure . . . .

J.A. at 2004-05. The district court noted that, in certain circumstances, it would have to determine whether government maltreatment of a prisoner could serve as a basis for a downward departure but that, even if this were an appropriate basis for a downward departure, the facts of the present case would not support it. In other words, the court concluded that, even if it had discretion to depart downward on this basis, it would not. For this reason, this issue is not reviewable on appeal.

### 2. Government's Cross-Appeal

In its cross-appeal, the government argues that the district court erred in assigning Anthony Corrado a total offense level of 27. The government argues that Anthony Corrado should have been assigned a total offense level of 36. According to the government, the district court erred (1) in sentencing Anthony Corrado with respect to only one underlying offense for the Count 1 RICO conspiracy, i.e., obstruction of justice;