RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0263p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

MICHAEL OWEN,

*Defendant-Appellant*.

No. 18-5736

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 1:12-cr-00138-1—Curtis L. Collier, District Judge.

Argued: June 20, 2019

Decided and Filed: October 10, 2019

Before: MERRITT, THAPAR, and READLER, Circuit Judges

───────────────

## COUNSEL

**ARGUED:** Jennifer Niles Coffin, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant. Brian Samuelson, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Jennifer Niles Coffin, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant. Brian Samuelson, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, Jay Woods, UNITED STATES ATTORNEY'S OFFICE, Chattanooga, Tennessee, for Appellee.

---

**OPINION**

---

CHAD A. READLER, Circuit Judge.   Methamphetamine may not be manufactured without governmental authorization.  21 U.S.C. § 841(a)(1); 21 U.S.C. § 843(a)(6).  Congress has regulated this practice in part to curb the unauthorized distribution of methamphetamine, which has a "detrimental effect on [our] health and general welfare."  21 U.S.C. § 801(2).  Yet equally detrimental, in many respects, is the process for manufacturing methamphetamine, which itself can have potentially hazardous consequences, if not done under appropriate conditions. *See* Hazards Of Illicit Methamphetamine Production And Efforts At Reduction: Data From The Hazardous Substances Emergency Events Surveillance System, U.S. Dept. Health and Human Services, Public Health Reports 126 (supp. 1), 121–22 (2011).  As the "illegal production of meth[amphetamine] often involves use of volatile chemicals and makeshift equipment, these sites can be extremely dangerous." *Id.*  Among the dangers is the risk that, during and after the manufacturing process, the ingredients and equipment will explode or otherwise catch fire. *Id.*

Reflecting those concerns, the Sentencing Guidelines impose a sentencing enhancement on one who, in illegally manufacturing methamphetamine, creates a risk of harm to others. U.S.S.G. § 2D1.1(b)(14)(C).   That enhancement is especially potent when a defendant's manufacturing presented "a substantial risk of harm to the life of a *minor*."   U.S.S.G. § 2D1.1(b)(14)(D) (emphasis added).   Crafting that Guidelines section was one thing, but applying it can be quite another. After all, given the various ways in which illegal methamphetamine manufacturing takes place, courts often have some interpretative work to do in assessing whether the conduct at issue rises to the level of creating a "substantial risk to the life of a minor."   In our mind, two principal considerations help inform whether a defendant's manufacturing satisfies the "substantial risk" threshold:  (1) the likelihood the conduct at issue risks harm to a minor; and (2) how serious that harm might be, should the risk come to pass.

We are asked to apply those considerations to a defendant who, while riding in a vehicle with a seven-year-old child, transported equipment that had been used to manufacture methamphetamine. In that setting, the equipment presented a modest risk of combustion, and thus a modest risk of injuring the minor. By the same token, any combustion would have been devastating to the minor, if not fatal. In this close case, we agree with the district court that, on balance, the likelihood of substantial injury to the child in the vehicle should the equipment combust constitutes a "substantial risk of harm to the life of a minor." We accordingly **AFFIRM** the judgment of the district court.

## I. FACTS AND PROCEDURAL HISTORY

Officer Ryan Patterson stopped a vehicle with four passengers, one of whom was seven years old. Another passenger, defendant Michael Owen, exited the vehicle while holding a black bag, and attempted to flee. Patterson gave chase. When he did, Owen returned to the vehicle and retrieved a short-barreled shotgun. He then fired at Patterson. Simultaneously, Patterson, who was not hit by Owen's shot, tased Owen. Owen dropped the shotgun and attempted to flee to a wooded area. At some point during his attempted flight, Owen also dropped the bag he was carrying. Ultimately, Patterson detained and arrested Owen, and recovered the bag.

Following an initial search of the bag, officers called in Officer Ryan Wilkey, who was trained in methamphetamine investigations. From the contents in the bag, Wilkey identified a clear plastic bottle containing "white sludge" covered with a copper-colored film. He also found lighter fluid, tubing, coffee filters, lithium batteries, a white powder, and a container of white pellets. Recognizing the dangers this collection of items presented, Wilkey moved the bottle away from the other chemicals, and then unscrewed the bottle's cap to release any pressure. A methamphetamine task force was later called in to neutralize and dismantle the remaining items. The task force then pH tested several chemicals, and discovered both strong acids and bases.

For this conduct, Owen was indicted and charged with six counts:

- Count One, attempt to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), & 846.

- Count Two, possession of equipment, chemicals, products, and materials that may be used in the manufacture of methamphetamine, in violation of 21 U.S.C. § 843(a)(6).

- Count Three, using, carrying, and discharging a firearm in relation to the drug trafficking crimes alleged in Counts One and Two, in violation of 18 U.S.C. § 924(c)(1)(A)

- Count Four, possessing and discharging a firearm during and in furtherance of the drug trafficking offenses charged in Counts One and Two, in violation of 18 U.S.C. § 924(c)(1)(A).

- Count Five, being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(2).

- Count Six, possession of an unregistered firearm, in violation of 26 U.S.C. §§ 5845(a), 5861(d), & 5871.

Owen subsequently pleaded guilty to Counts One (attempt to manufacture methamphetamine) and Three (discharging a firearm in furtherance of a drug offense) of the indictment. Per the plea agreement, the district court dismissed the remaining counts.

Before his guilty plea, Owen filed various motions for psychological examinations, which the district court granted. Owen later filed a motion for a competency hearing. The district court held a hearing and, almost five years after Owen was indicted, found him competent to stand trial, at which point Owen pleaded guilty to the two counts.

The presentence report (or "PSR") set Owen's base offense level at 12. Owen's offense level was increased pursuant to § 2D1.1(b)(14)(D) of the Sentencing Guidelines on the grounds that Owen's methamphetamine-manufacturing offense created a "substantial risk of harm to the life of a minor." Where a defendant's conduct qualifies for that enhancement, the defendant's offense level is increased by six levels, or raised to an offense level of 30, whichever is greater. Owen's offense level was thus raised to 30, and then adjusted downward three levels, to 27, for accepting responsibility for his crimes. Owen was also deemed to have had a criminal history category of VI.

As calculated in the PSR, the Sentencing Guidelines range for an offense level of 27 with a criminal history category of VI was 130 to 162 months. Because Owen discharged a firearm, he was subject to a 120-month mandatory minimum sentence pursuant to 18 U.S.C. § 924(c)(1)(A). As a result, Owen's sentencing range was 250 to 282 months of imprisonment.

At Owen's sentencing hearing, the parties took up Owen's enhancement for creating "a substantial risk of harm to the life of a minor." U.S.S.G. § 2D1.1(b)(14)(D). To support the sentencing enhancement, the government called two witnesses: Wilkey and Agent David Shelton of the Tennessee Bureau of Investigation Dangerous Drug Task Force.

Wilkey testified that the bag carried by Owen contained equipment and chemicals used for the manufacture of methamphetamine, including a one-pot shake bottle. But Wilkey added little more. For instance, he testified that the one-pot did not appear to contain an ongoing reaction and that he did not smell the odor normally associated with one-pot cooking of methamphetamine.

Shelton filled in many of the gaps. Shelton first explained the process for manufacturing methamphetamine. Turning to the items in Owen's bag, Shelton testified that the chemical reactions that took place in the one-pot had finished and that the methamphetamine had been removed prior to the one-pot being seized by law enforcement. And although he did not see lighter fluid and water in the bottle, Shelton, based on his experience and training, testified that those items had to be in the bottle, as he had never known a methamphetamine cook able to remove all the fluids. Much the same was true, Shelton testified, with respect to unreacted lithium. Here again, while Shelton could not see any lithium in the photographs of the one-pot, and while no laboratory testing was completed to produce evidence of unreacted lithium, he testified that he had never seen a one-pot in which there was no unreacted lithium. Shelton further testified that the chemicals found in the bag were hazardous: they were not in their original containers, were flammable, and could "cause chemical burns" by "eating your skin." There was thus a "distinct possibility," Shelton concluded, that the contents of the bottle could create a fire.

Taking all of this into account, the district court was left to determine whether Owen's methamphetamine-manufacturing conduct "create[d] a substantial risk of harm to the life of a minor." In weighing that determination, the district court turned to the factors cited by the Sentencing Commission in its comment in the Application Note supporting U.S.S.G. § 2D1.1. These four factors included: (1) the quantity of hazardous chemicals and the manner in which they were stored, (2) the manner in which the chemicals were disposed, (3) the duration and the extent of the manufacturing operation, and (4) the location of the factory and number of lives placed at risk. U.S.S.G. § 2D1.1, cmnt. n. 18(B)(i). As chemical disposal, the second factor, was not at issue, the district court focused on the three remaining factors.

Regarding the first, the district court determined that, while the quantity of chemicals was low, it was nonetheless highly dangerous. In addition to the flammable chemicals found outside the bottle, the district court noted that the lithium inside the bottle could react with moisture to cause an explosion. As to the third and the fourth factors, the district court determined that materials previously used for manufacturing methamphetamine were then stored in a moving vehicle. And while the ride may have been short, loosely storing those chemicals together in a bag and then transporting them by vehicle was an inherently dangerous endeavor, one that raised the possibility of "extreme injury" to a minor. For these reasons, the district court overruled Owen's objections and applied the sentencing enhancement.

Owen moved for a downward variance, asking the district court to impose a 180-month sentence. That sentence was sufficient, Owen contended, in view of his background and mental health history. Agreeing that Owen had shown he suffered from a mental illness, the district court nonetheless noted that Owen had not demonstrated a specific diagnosis or condition. Nor, more critically, had Owen demonstrated how that mental health condition contributed to his criminal behavior. Accordingly, said the district court, Owen failed to demonstrate that a downward variance was appropriate. After examining the purposes of sentencing set forth in 18 U.S.C. § 3553(a), the district court sentenced Owen to a 250-month term—the bottom end of the applicable Sentencing Guidelines range.

## II. ANALYSIS

**A.     Owen Created A "Substantial Risk Of Harm To The Life Of A Minor."**

One issue is front and center in this appeal:  Whether Owen created a "substantial risk of harm to the life of a minor" through his conduct involving manufacturing methamphetamine. U.S.S.G. § 2D1.1(b)(14)(D).  The district court concluded that he did and increased his sentence accordingly.

Owen challenges two aspects of the holding below.  One, that the district court erred in finding, as a factual matter, that Owen transported in a vehicle dangerous items that presented a risk of harm to a minor riding in the vehicle.  And two, even if those findings were correct, Owen's conduct, as a legal matter, did not present a "substantial risk of harm" to the minor.  To Owen's mind, any "risk" was at most speculative, and not grounded in science.

"[W]e review for clear error" the district court's "factual findings."  *United States v. Corrado*, 304 F.3d 593, 607 (6th Cir. 2002) (citations omitted).  "If the district court's factual findings are not clearly erroneous," then we review "de novo the determination that the conduct in question constituted relevant conduct" under the Guidelines provision at issue.  *Id.* (citations and internal quotation marks omitted).

**1.     The district court's factual findings were not "clearly erroneous."**

Much of this case turns on the district court's factual findings regarding the items and materials Owen was transporting.  In light of our "clear error" standard of review, Owen has a tall hill to climb in challenging those findings.  To our eye, he has not done so.

In issuing its factual findings, the district court thoughtfully considered the record below. The district court found that Owen manufactured methamphetamine and after having done so, put the manufacturing instruments in a bag.  Those instruments included a one-pot, in which chemical reactions had previously occurred.  In the one-pot, the district court concluded, there remained sludge containing lithium particles or pieces, along with water or moisture. The district court likewise found the existence of other "dangerous and extremely hazardous" materials in the bag, a collection of items that, together, presented a risk of explosion.  And yet

Owen then placed that bag in a vehicle—the one both he and a minor were travelling in when stopped by an officer.

Testimony at the sentencing hearing confirmed these conclusions. Wilkey testified that he found a bag containing a "one-pot shake bottle." Shelton testified that the one-pot contained "meth sludge." And, he explained, the sludge that remained in the bottle would have contained unreacted lithium and water or lighter fluid. Shelton also testified that the other chemicals found in the bag could "cause chemical burns" so severe that they would "eat[] your skin."

All told, the district court's factual findings were not clearly erroneous. *See Corrado*, 304 F.3d at 607.

## 2. The district court properly applied Guidelines § 2D1.1(b)(14)(D).

Accepting these factual findings, we turn to the district court's determination that this chain of conduct presented a "substantial risk of harm to the life of a minor." U.S.S.G. § 2D1.1(b)(14)(D). Unlike our more cramped review of the factual findings below, we take a fresh look at the district court's interpretation and application of the Guidelines provision. But even with a fresh perspective, we find no error in the district court's application of § 2D1.1(b)(14)(D).

1. In what circumstances does one, in illegally manufacturing methamphetamine, create a "substantial risk" of harm to another? Although the Sentencing Commission has not expressly defined that phrase in § 2D1.1, the Commission has offered a commentary in the section's Application Note to help us interpret the provision. There, the Commission identified four factors that, to its mind, inform the "substantial risk" determination:

> (I) The quantity of any chemicals or hazardous or toxic substances found at the laboratory, and the manner in which the chemicals or substances were stored.

> (II) The manner in which hazardous or toxic substances were disposed, and the likelihood of release into the environment of hazardous or toxic substances.

> (III) The duration of the offense, and the extent of the manufacturing operation.

> (IV) The location of the laboratory (*e.g.*, whether the laboratory is located in a residential neighborhood or a remote area), and the number of human lives placed at substantial risk of harm.

U.S.S.G. § 2D1.1, cmnt. n. 18(B)(i).

The Application Notes and supporting commentary reflect the Commission's interpretation of the Guidelines. *Stinson v. United States*, 508 U.S. 36, 41 (1993). That interpretation, of course, is not binding in the way an agency rule would be, where the rule has journeyed through a formal rule-making process, including the notice and comment aspects. *See United States v. Havis*, 927 F.3d 382, 385–86 (6th Cir. 2019) (en banc). Where an agency rule is considered ambiguous, we typically afford some deference to the agency's interpretation of the rule. *See Auer v. Robbins*, 519 U.S. 452, 461–62 (1997). But when to do so, and what standards to apply when we do, are at the moment matters of some debate. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (noting that "not every reasonable agency reading of a genuinely ambiguous rule should receive *Auer* deference"); *Havis*, 927 F.3d at 386 ("[W]e need not accept an interpretation that is plainly erroneous or inconsistent with the corresponding guideline.") (internal quotations omitted). For now, we need not wade into those murky waters. As no party has challenged § 2D1.1(b)(14)(D) as ambiguous, as the Application Note in question does not purport to add to or change the ordinary understanding of the section, as we largely embrace the interpretation included in the Application Note, and as no party has challenged any aspect of the Application Note, we see no issue in referencing the principles therein as an analytical starting point.

But those factors are just that—a starting point. We can narrow these factors even more where there is no issue with respect to the disposal of toxic substances (factor II). *See* U.S.S.G. § 2D1.1, cmnt. n. 18(B)(i)(II). And as to the Application Note's three remaining factors, they in some ways cover common ground. We can thus sharpen these factors into two key considerations to guide our assessment of "substantial risk" in this setting: (1) the likelihood the conduct at issue risks harm to another (in this case, a minor), and (2) how serious that harm might be, should the risk come to pass.

In weighing these factors, some cases will be easy.  Where the conduct at issue is likely to cause harm, and the harm that ensues would be severe, that course of action would easily satisfy the "substantial risk" test.  By the same token, where the likelihood of harm is low, and the harm most likely to ensue is not serious, that conduct seemingly would not reach the "substantial risk" threshold.

Those are the easy cases.  More difficult is a case, where, like here, the likelihood of harm is tangible but low, but the resulting harm catastrophic.  Or where the likelihood of harm is high, but the likelihood of severe harm is tangible but low.  In each setting, we must weigh those dual considerations to determine whether they together satisfy the "substantial risk" standard.  By and large, that analysis is more qualitative than mathematical.  *See Jones v. United States*, 527 U.S. 373, 408 n.8 (1999) (Ginsburg, J. dissenting).

2. Application of these two guideposts cut across our cases applying § 2D1.1's "substantial risk of harm" standard.  Start with *United States v. Layne*, 324 F.3d 464 (6th Cir. 2003).  There we applied the sentencing enhancement for endangering human life, U.S.S.G. § 2D1.1(b)(14)(C) (then numbered as U.S.S.G. § 2D1.1(b)(6)(A)), a parallel provision to the enhancement for endangering the life of a minor.  *Layne*, 324 F.3d at 468–71.  In assessing whether the conduct at issue risked harm to another, we noted that several dangerous chemicals were present at the manufacturing lab for more than two weeks.  *Id*.  Thus, there was a relatively high likelihood of an explosion.  And because the laboratory was housed in an apartment, a "densely settled area," if an explosion did occur, it was likely that one or more people would be severely injured.  *Id.* at 471.

In *United States v. Davidson*, 409 F.3d 304 (6th Cir. 2005), these factors weighed the other way.  In *Davidson*, there was a low probability that the laboratory in question would explode or catch fire.  The defendant did not have a large quantity of chemicals, and the manufacturing operation had not been in place for any extended period.  *Id*. at 313.  Equally low was the chance of harm, should an explosion occur.  The defendant kept the methamphetamine laboratory in a locked barn loft in a remote location, and precautions had been taken to keep people away from the operation.  *Id*. at 314.  Because the risk of harm was low, and the likelihood of grave harm equally low, we denied application of the enhancement.

3. Today's case falls somewhere between *Layne* and *Davidson*. In evaluating the risk to another caused by Owen's conduct, we consider the location of his manufacturing-related conduct. Owen placed his manufacturing materials in a vehicle, making that vehicle the methamphetamine laboratory for purposes of our sentencing analysis. *See United States v. Pinkerton*, 279 F. App'x 382, 384 (6th Cir. 2008) (holding that it was not erroneous for the district court to treat the defendant's vehicle as a laboratory). To be sure, the typical case involves a more constant laboratory space, like a home, shed, or barn. But we see no reason to treat a vehicle differently. After all, if one who implements some, but insufficient, safety measures in a static laboratory can create a substantial risk to others, so too can a person who implements no safety measures while transporting those same laboratory materials. *See id.*

With respect to the risks presented by Owen's methamphetamine laboratory, the district court determined that transportation of lithium in a vehicle was "not a safe activity." That lithium—along with several other dangerous chemicals—was transported "without any safety precautions." The one-pot and chemicals were found in a bag, emphasizing Owen's lack of safety measures. And while the cook operation occurred prior to the vehicle ride, not during it, transportation of manufacturing equipment and materials by vehicle presented its own safety risks.

The district court likewise noted the serious harm to a minor that would likely have occurred had those these risks come to pass. The combustible bag was confined in a vehicle, in close proximity to the minor. Suffice it to say, in a moving vehicle, there is no escape route in the event of an explosion. It thus takes little imagination to see that any combustion would have been significantly likely to cause grave harm to that minor.

For these reasons, we agree with the district court's application of the sentencing enhancement. While the quantity of hazardous substances was low and combustion far from inevitable, the dangers posed were exacerbated by the way the substances were stored. And no one can question the grave risk an explosion would have presented to the seven-year old riding alongside those materials. *See, e.g.*, *United States v. Finch*, 342 F. App'x 565, 569 (11th Cir. 2009) (applying enhancement where defendant had "transported anhydrous ammonia in an unapproved container and in a vehicle occupied by [his] two-year-old daughter").

All of that said, this case is undoubtedly close. As to the risk of harm, there was not an overwhelming likelihood of an explosion in the vehicle. By the same token, we cannot understate the harm an explosion would have caused. Upon careful consideration of the unique facts of this case, we hold that Owen created a "substantial risk of harm to the life of a minor." Even a small chance of combustion can create a "substantial risk" when the combustible material is transported in a dangerous manner, in a confined space, in the presence of a minor.

4. Owen makes several counter points. First, he contends that any risk to a minor presented by his conduct was not substantial, citing as support our decision in *Davidson*. There, as noted, we reversed a district court's application of a "substantial risk" enhancement where the methamphetamine laboratory at issue was locked in a barn in a remote location. *Davidson*, 409 F.3d at 313–14. That is a far cry from this case. Owen did not take efforts to safely store his laboratory materials, as was the case in *Davidson*, nor can a bag in a vehicle be considered a remote location when a child is on board.

Owen next takes issue with the government's reliance on *Finch*. He distinguishes that case on the grounds that he did not transport anhydrous ammonia, and that as to the substances he did transport, the government failed to prove they were dangerous. Yes, the chemicals may not be the same. But a risk of combustion is a risk of combustion, no matter the material in question. And here, the evidence revealed that both water and lithium had to be present in the materials previously used as a one-pot for manufacturing methamphetamine. Owen does not contest that this collection of items, taken together, were combustible, nor does he contest that he transported them in a vehicle with a child.

Next, Owen offers several alternative definitions of "substantial risk," definitions that he believes are better suited for analyzing his conduct. Owen finds those definitions in cases addressing the Armed Career Criminal Act (18 U.S.C. § 924(e)), the Eighth Amendment to the United States Constitution, and the Ohio Revised Code. Assessing risk in those unique settings, however, involves different considerations and different underlying objectives. While non-binding, the Sentencing Commission provided a list of factors to consider in determining whether a "substantial risk of harm" was posed. In a case like this one, where environmental

concerns are not present, we can distill those factors down even further, to the two noted above. We rely on those considerations here.

But, says Owen, if we affirm his enhancement here, our test amounts to no test at all. To the contrary, we have given examples of when that test will—*and will not*—be met. And we have described this case as very close. Yet in applying the two factors articulated above, we believe they tip in favor of applying the enhancement. To repeat: Owen did not merely transport methamphetamine-making material in a vehicle; he transported previously used methamphetamine-making materials, including a container of lighter fluid, along with a combustible mix of lithium and liquid, in a vehicle, in a dangerous manner, with a minor present. Such a grave threat to the life of a minor, even if not overwhelmingly likely to come to pass, safely falls within the "substantial risk" heartland.

It bears repeating that there will be cases when § 2D1.1(b)(14)(D) is more easily satisfied—that is, cases where the likelihood of harm to a minor is even greater. *See, e.g.*, *United States v. Merrell*, 213 F. App'x 402, 405–08 (6th Cir. 2007) (applying enhancement to defendant that possessed vast amounts of toxic chemicals, disposed of hazardous waste in trash cans, had been manufacturing for more than two years, and did so in a home where multiple minors lived.) While today's case may be closer to the margin, a preponderance of the evidence supports application of the § 2D1.1(b)(14)(D) enhancement. *See United States v. Angel*, 576 F.3d 318, 321 (6th Cir. 2009).

**B.     Owen's Sentence Was Not Substantively Unreasonable.**

Owen also argues that the district court abused its discretion by denying his motion for a downward variance and entering a substantively unreasonable sentence. Owen bases these challenges primarily on the fact that he suffered from a mental illness.

The district court sentenced Owen to 250 months—the very bottom end of the sentencing range proposed by the Guidelines. In assessing whether that sentence is substantively unreasonable, we in essence ask whether the "sentence is too long." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). In so doing, we assess whether the district court balanced the 18 U.S.C. § 3553(a) factors correctly or if it placed too much weight on some factors, not enough

on others. *Id.* Our standard of review is deferential. *United States v. Parrish*, 915 F.3d 1043, 1047 (6th Cir. 2019), *petition for cert. filed*, (U.S. July 2, 2019) (No. 19-5123). We give considerable deference to a district court's decision about the appropriate length, and we treat a within-Guidelines sentence, like the one Owen received, as presumptively reasonable. *Id.*; *see also United States v. Sexton*, 512 F.3d 326, 332 (6th Cir. 2008). And rebutting that presumption is "no small burden;" we "will not generally second guess sentences on substantive grounds when they fall in the range prescribed by the Guidelines." *United States v. Simmons*, 587 F.3d 348, 365 (6th Cir. 2009) (citation omitted).

While a district court should, in the sentencing context, give consideration to a defendant's mental illness, the court is not required to grant a defendant's motion for a downward variance whenever a defendant suffers from such an illness. *See, e.g.*, *United States v. Tolbert*, 459 F. App'x 541, 547–48 (6th Cir. 2012) (affirming district court where it acknowledged that defendant suffered from a mental illness but found that the need to protect the public required a Guidelines-range sentence); *United States v. Mills*, 364 F. App'x 217, 220–21 (6th Cir. 2010) (affirming district court's within Guidelines-range sentence where the defendant's mental illness did not explain his criminal activity). Although the district court here ultimately denied Owen's motion for a downward variance, the court did consider Owen's claim that he suffered from mental illness. The district court first considered the PSR, which offered the opinion that Owen's mental illness did not impair his ability to appreciate the wrongfulness of his actions. Although Owen objected to some portions of the PSR, the district court adopted it without change.

The district court then considered Owen's mental health history in addressing the 18 U.S.C. § 3553(a) factors. The district court "credit[ed] the defendant's argument that he does suffer from a mental illness" but noted that Owen had failed to present evidence that allowed the court "to specify exactly the type of the illness or the correct diagnosis," or whether that illness contributed to his criminality. The district court added that Owen's sentence must be "sufficient but not greater than necessary." The district court weighed those considerations against Owen's "very, very serious" criminal conduct. The district court also highlighted the need to deter others from engaging in the same conduct, and the need to protect the public. Against this backdrop,

we cannot say that the district court abused its discretion by denying Owen's motion for a downward variance and imposing a 250-month sentence.

## III. CONCLUSION

For these reasons, we **AFFIRM** the judgment of the district court.