RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0275p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

           *Plaintiff-Appellee*,

     *v.*

MARIO D. ADAMS,

           *Defendant-Appellant*.

> No. 23-3524

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:14-cr-00230-1—Benita Y. Pearson, District Judge.

Decided and Filed:  December 30, 2024

Before:  MOORE, MURPHY, and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:**  Andrew Byrd, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant.  Kevin Bringman, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

─────────────────

## OPINION

─────────────────

BLOOMEKATZ, Circuit Judge.  Mario Adams, a defendant with a history of mental health issues, challenges the district court's decision to give him the statutory maximum sentence of 24 months' imprisonment for violating the terms of his supervised release.  Adams contends that this sentence was procedurally unreasonable because the district court improperly considered his mental health as an aggravating factor in its sentencing determination. The district court's sentence was based on permissible factors, not on Adams's mental health status, so we affirm.

**BACKGROUND**

**I.        Relevant Prior Proceedings**

In 2014, Mario Adams was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).   Before trial, the district court ordered a psychiatric evaluation to assess Adams's mental competence.  A forensic psychologist at a New York prison conducted the examination, and in January 2015, the district court concluded that Adams was not fit to stand trial.  This finding led to his commitment to the Attorney General's custody.

The psychologist's report painted a troubling picture of Adams's mental health history. During his teenage years, Adams was diagnosed with schizoaffective disorder and schizophrenia, paranoid type.  As he grew older, he also began to display symptoms consistent with bipolar disorder accompanied by psychotic features.  These mental health challenges were compounded by substance abuse issues.  Adams began using drugs and alcohol at age twelve, leading to multiple stays in treatment facilities over the years.  Throughout his life, Adams had amassed an extensive history of psychiatric hospitalizations and suicide attempts, further underlining the severity and persistence of his mental health challenges.

In the months following the initial evaluation, Adams underwent further competency assessments.  In May 2015, a second psychologist also deemed him incompetent to stand trial.  A third evaluation in November 2015, however, determined that he was competent.  In March 2016, Adams stipulated to his competency and pleaded guilty.  The district court sentenced him to 87 months in prison followed by a 36-month term of supervised release.

**II.       Supervised Release Violations**

In October 2020, Adams was released from prison and began his term of supervised release.  Two months later, probation officers notified the district court that Adams had violated the terms of his supervised release.   Specifically, Adams missed three random drug tests, violating the mandated drug testing program.  The probation officer's report further detailed Adams's ongoing struggles with mental health and substance abuse.  According to the report, Adams met the diagnostic criteria for multiple conditions: antisocial personality disorder or

another personality disorder, specified trauma-related disorder, schizophrenia disorder, stimulant use disorder, severe cannabis use disorder, and severe alcohol use disorder.

In February 2021, probation officers once again reported that Adams had failed to comply with the terms of his supervised release. This time, Adams failed to allow for home visits. He also missed required drug tests and lost his job due to poor attendance. Given these violations, the probation officers recommended, and the district court ordered, that Adams complete a 4-month stay in a halfway house.

Adams's stay at the halfway house did not go smoothly. Over the course of his stay, Adams repeatedly failed drug tests and lost another job due to an argument with his boss. His behavior ultimately led to an unsuccessful discharge from the halfway house. In June 2021, his probation officer recommended a warrant for his arrest, citing ongoing violations of supervised release terms, and suggested inpatient treatment. The officer noted that Adams had undergone a psychological examination and received prescription medication. Shortly after this recommendation, the police arrested Adams and took him into custody.

In August 2021, Adams appeared in court for his supervised release violations. The district court sentenced him to time served since his June arrest, mandated a new 90-day stay at the halfway house, and imposed a new 30-month supervised release term with the stipulation that he adhere to his prescribed mental health medication regimen. During most of his new stay at the halfway house, Adams showed significant improvement, complying with the rules, keeping a steady job, taking his medications, and managing his illness. With only sixteen days left in his stay, however, Adams disappeared after a counseling appointment, triggering an arrest warrant. When his probation officer reached him on the phone days later, Adams explained that he left the halfway house because the staff lost his personal belongings and ruined his transitional housing plans, and that he left his job because his coworkers had spread rumors about him.

For approximately a year, Adams had no contact with his probation officers, and they were unable to locate him. During that year, Adams was arrested and charged with two state crimes—felony assault and breaking and entering. The felony assault charge stemmed from a November 2021 incident in Cleveland during which Adams reportedly choked a woman,

slammed her head against the wall, and punched her face.  Adams ultimately pleaded guilty to felony aggravated assault.  The breaking and entering charge related to an incident in September 2022, when Adams broke into a construction site.  When Adams was apprehended, officers reportedly found him carrying pliers and a flashlight.  Adams pleaded guilty to this charge as well.  Adams was not sentenced to incarceration for either offense.  The Cuyahoga County Court of Common Pleas sentenced Adams to two years of community control under mental health supervision for both crimes, with conditions including treatment compliance and probation reporting, and ordered him to a community-based correctional facility.

### III.    Revocation Sentencing

In June 2023, the district court revoked Adams's supervised release based on three violations, none of which Adams contested: one violation for abandoning the halfway house and failing to check in with probation officers, and two violations for his state crimes.  The court first determined that Adams was sufficiently competent to proceed with the revocation hearing, relying on a January 2023 competency report prepared for the Cuyahoga County Court of Common Pleas.  This report documented Adams's violent ideations.  The court sua sponte distributed this report to both parties at the start of the hearing; neither had prior access to it.  The report was not entered into the record.[1]

The court then calculated the Guidelines range as 8 to 14 months in prison.  Neither party objected.  The government advocated for a sentence at the upper end of the Guidelines range. While the government acknowledged that Adams had "significant mental health issues that contribute to his lawlessness," it emphasized that Adams was not accepting help with these issues.  Sent'g Tr., R. 113, PageID 518–19.  And the government stressed the violent nature of Adams's aggravated assault charge.  It also noted that the competency evaluation showed that Adams had violent ideations.  The government argued that a high Guidelines sentence was necessary to promote respect for the law and to protect the public from Adams.

Adams's attorney highlighted his progress at the halfway house—his adherence to the medication regimen, his consistent job, and his mental health improvements—and argued that,

---

[1]We obtained the report from the Clerk of Court for the Northern District of Ohio.

with continued support, Adams could again be a law-abiding working citizen.  In his lawyer's telling, Adams's departure from the halfway house was attributable to an unfortunate series of setbacks, including Adams's grandmother's passing and staff at the halfway house losing his personal items and preventing him from securing transitional housing.  His counsel maintained that Adams had been homeless and living on the streets during the year in which he had absconded, explaining that Adams had broken into the construction site so he could have a "roof over his head."  *Id.* at PageID 524–25.  Adams's attorney therefore asked the district court for a sentence of time served, along with new terms of state and federal supervised release to be served concurrently.  Adams himself then spoke, stating that he made "no excuses" for his actions.  *Id.* at PageID 527.  But, he explained, the combination of the halfway house losing his items and preventing him from securing transitional housing, coupled with multiple family deaths, had left him in a "real rough spot."  *Id.* at PageID 527–28.

The district court responded and expressed its frustration that, despite its prior efforts to help him, Adams had violated the terms of his supervised release.  It noted that it had previously given Adams a "place to stay" by ordering him to stay in the halfway house.  *Id.* at PageID 529. It elaborated that it believed that Adams could "live well," despite his mental health issues, and that "that's what [the district court] tried to give" Adams—"a roof over [his] head" so that he "could earn money, get a job," and "get [his] own housing."  *Id.* at PageID 530.  Yet Adams had left the halfway house for "nearly a year" without reaching out to his probation officer or to the judge.  *Id.* at PageID 529.  And, the district court emphasized, in the year in which Adams had absconded, he had been "involved in violence"—referencing the felony assault charge.  *Id.* at PageID 530.  The district court stated that the fact that Adams "would lay hands on another person" was "totally unacceptable" and meant that "society is not safe with [Adams] in it."  *Id.* at PageID 531.  The district court then acknowledged Adams's statement that his behavior was triggered in part by deaths in his family.  But the court noted that "death is a part of life"—so if Adams was going to "be violent" every time he faces such a loss, "we're all in danger when [Adams is] not controlled."  *Id.* at PageID 532.

The district court declared that, after having "denigrated" himself, "shown no respect for the law by committing violence," and committed other offenses, Adams could not return to the

district court and ask to start over.  *Id.* at PageID 531.  As the district court explained, notwithstanding its attempts to help Adams and sentencing him only to a term of supervised release, the "circumstances today are very different": Adams had been violent and had broken the law, so he needed deterrence.  *Id.*

After its review, the district court concluded that it was imposing an above-Guidelines sentence of 24 months in prison—the statutory maximum and nearly double the high end of the Guidelines range.  The district court explained that this decision was based on three 18 U.S.C. § 3553(a) factors: promoting respect for the law, deterrence, and protection of the public.  It stated that it wanted Adams to "reconsider [his] behaviors whenever [he is] inclined not to take [his] medication, to act out in a violent way, to stay away for a year."  *Id.* at PageID 532.

Adams objected.  His counsel argued that "the upward variance is not justified" and asked the court "to consider his mental health issues as a reason for mitigation and reason not to upward vary."  *Id.* at PageID 533.  The court, however, overruled the objection.  It first explained that the Guidelines are designed for the "average individual"—and the average individual is "not someone who has committed violence, who has absconded for nearly a year."  *Id.* at PageID 533–34.  The Guidelines range of 8 to 14 months was accordingly inappropriate for Adams's particular circumstances.  The district court continued: "Even with [Adams's] mental health considerations, and I can do nothing but consider them, I believe the upward variance is a better response than the 8 to 14 months."  *Id.* at PageID 534.  The court emphasized that Adams had reoffended, even though the court had given "[e]very consideration" to Adams "in the past to allow [him] to address [his] mental health conditions, including a place to live, instructions to be under mental healthcare, and even to take [his] medication as prescribed."  *Id.*  The court then stated that it was "explicitly overruling" Adams's objection that it had "not given enough consideration to [his] mental health."  *Id.* at PageID 534–35.  Contrary to Adams's objection, the district court explained, it had "done nothing but consider [Adams's] mental health in addition to those who should be able to enjoy freedom in this society without being under threat from someone who avoids his own issues by refusing treatment."  *Id.* at PageID 535.

Adams timely appealed the district court's sentence.

## ANALYSIS

On appeal, Adams challenges the procedural reasonableness of his sentence. He contends that the district court used his mental illness to justify its upward variance from the Guidelines range, and thereby relied on an impermissible factor in determining his sentence. We address the applicable standard of review before proceeding to the merits of Adams's claim. Because the district court did not improperly rely on Adams's mental health status as the basis for its upward variance, we affirm.

## I.    Standard of Review

We generally review procedural reasonableness challenges for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). But the government contends that Adams did not adequately preserve his procedural reasonableness argument, meaning that we should review it only for plain error. *See United States v. Bostic*, 371 F.3d 865, 872–73 (6th Cir. 2004). We disagree. To preserve for appellate review an objection to a procedural error at sentencing, a party must object with the "reasonable degree of specificity which would have adequately apprised the trial court of the true basis for his objection." *Id.* at 871 (citation omitted). Adams did just that. When the district court asked whether there were objections to its sentencing determination, Adams's counsel contested the upward variance, asserting that the court should "consider his mental health issues as a reason for mitigation and reason not to upward vary." Sent'g Tr., R. 113, PageID 533. That's sufficient to preserve Adams's argument that the district court improperly considered his mental health status.

The government's argument that this objection does not preserve Adams's procedural reasonableness challenge hinges on a suggested distinction between his current argument that a court *cannot* consider mental health as a basis for an upward variance and his initial objection that the court *should not* vary upward because of his mental health. But both formulations challenge how the district court should treat mental health, so Adams adequately preserved his objection. The purpose of the contemporaneous objection rule is to give the district court "an opportunity to address the error in the first instance" and facilitate more "meaningful" appellate review. *Bostic*, 371 F.3d at 871. Adams's objection at sentencing fulfilled both these purposes,

and the district court responded to the objection by explaining how Adams's mental health struggles factored into its sentencing determination. Accordingly, even under the government's read of Adams's objection, it carried the "reasonable degree of specificity" required to preserve his challenge. *Id.* So we review for abuse of discretion, not plain error. *United States v. Taylor*, 800 F.3d 701, 713 (6th Cir. 2015).

## II.    **Procedural Reasonableness Challenge**

A sentence imposed upon revocation of supervised release, like an original sentence, must be procedurally reasonable. *United States v. Bolds*, 511 F.3d 568, 578 (6th Cir. 2007). When a district court "considers an impermissible factor in sentencing," that is an abuse of discretion rendering the sentence procedurally unreasonable. *United States v. Fowler*, 956 F.3d 431, 440 (6th Cir. 2020).

Adams argues that the district court considered an impermissible factor in deciding whether to vary upward: Adams's "future dangerousness based on his mental health issues." Appellant's Br. at 11. Adams contends that the district court "accepted the premise" that Adams was mentally ill and that Adams's "poor decisions" stemmed from his "unmedicated illness." *Id.* at 14. But then, in Adams's view, the court inappropriately used that mental illness as an aggravating sentencing factor instead of a mitigating one, choosing a longer sentence to account for the fact that the public needed to be protected from Adams because of his mental illness.

Adams argues that this line of reasoning is forbidden by this court's case law, primarily *United States v. Moses*, 106 F.3d 1273 (6th Cir. 1997). In *Moses*, a defendant with serious mental health issues had been "confined, as a committed patient," for over a year prior to his sentencing. *Id.* at 1275. Because the defendant had already been detained for longer than the calculated Guidelines range for his sentence, a within-Guidelines sentence would have resulted in his imminent release. *Id.* This concerned the district court. If the defendant was immediately released from prison, the court feared, he would cease taking his psychiatric medication and become a danger to the community because of his mental illness, which included paranoid schizophrenia with violent ideations. *See id.* at 1275, 1277. Citing public safety concerns, the district court departed upward from the Guidelines range and sentenced the defendant to 10 years

in prison. *Id.* at 1277. We held that the district court's decision was erroneous. Reviewing the Guidelines sections upon which the district court had relied, we explained that neither provision permitted an upward departure to account for a defendant's mental illness. *Id.* at 1278–80. We reasoned that a different statutory scheme provided "the appropriate mechanism" for addressing the public safety concerns associated with releasing mentally ill defendants at the end of their sentences, "rather than an extended criminal sentence." *Id.* at 1281.

Adams raises important questions about whether district courts may vary a sentence upwards to account for the risk of danger a defendant may pose to the community because of his mental health issues. The government, for its part, contends that *Moses* does not support Adams's argument, both because *Moses* concerned an earlier, binding version of the Sentencing Guidelines and because it addressed a sentencing departure, rather than a variance.

We need not resolve this dispute, however, because we affirm the district court on a different basis. Having reviewed the sentencing proceedings, we disagree with the premise underlying Adams's argument—that the district court relied on the risk of danger attendant to Adams's mental illness itself (i.e., his diagnosis and mental health evaluations) as the basis for its upward variance. Rather, it appears from the sentencing transcript that the district court based its sentence on Adams's conduct, including his choice to leave the halfway house early, his criminal activity during the year in which he absconded, and the failure of its previous interventions to prevent him from committing further offenses. To be sure, some of this conduct may have stemmed, at least in part, from mental illness. But a district court may rely on a defendant's past conduct in determining the appropriate sentence. *See United States v. Lanning*, 633 F.3d 469, 475 (6th Cir. 2011) (noting that a defendant's "criminal history" and "likelihood of reoffending" can form the basis for an upward variance). Adams does not argue otherwise.

In sentencing Adams, the district court reviewed Adams's past conduct in detail, including his previous supervised release violations and its previous attempted interventions. Critically, this revocation hearing was not the district court's first encounter with Adams. For Adams's previous supervised release violations, the district court imposed noncustodial terms. Recognizing Adams's mental health challenges, it ordered Adams to stay at a halfway house (twice), to participate in counseling, and to take his prescribed medications. In short, in response

to Adams's previous violations, the district court treated Adams's mental health challenges as a mitigating factor and focused on providing Adams with stability and treatment.

Despite those efforts, Adams absconded from the halfway house and committed two additional state crimes. From this conduct, the district court appeared to conclude that another like intervention would be insufficient to protect the public, to deter Adams from reoffending, and to promote respect for law. *See* 18 U.S.C. § 3553(a). The district court first summarized the steps that it had taken in its prior sentencing to help Adams and then explained that, considering Adams's recent conduct, the circumstances were now "very different." Sent'g Tr., R. 113, PageID 531. The district court told Adams: "You've shown yourself to be violent, to not respect the law. I need to deter you." *Id.* It emphasized the violent nature of one of Adams's two criminal offenses, noting that the fact that Adams had laid hands on another person was "totally unacceptable" and meant that "society is not safe with [Adams] in it." *Id.* And the district court pointedly told Adams that a family death was not an excuse for violence and disobeying the law, explaining that if Adams was to become violent each time he experienced loss, he would continue to be a danger to the public. Focusing on Adams's supervised release violations, the district court concluded that a within-Guidelines sentence was insufficient for someone who has "absconded for nearly a year" and has "committed violence." *Id.* at PageID 533–34. Thus, the district court's stated rationale for its chosen sentence focused on Adams's conduct—the nature of his violations of supervised release—not on mental health status.

Adams emphasizes that the district court repeatedly mentioned his mental health issues during the sentencing proceeding. True enough. But we do not read the district court as regarding Adams's mental health issues as an *aggravating* factor. To the contrary, the district court's discussion of Adams's mental health concerns appears to have focused on why the district court concluded that because of Adams's recent conduct, it could no longer treat Adams's mental illness as a *mitigating* factor, as it had done in Adams's prior sentencings. After Adams's counsel asked the district court to consider Adams's mental health issues as a mitigating factor, the district court explained: "*Even with* [Adams's] mental health considerations, and I can do nothing but consider them, I believe the upward variance is a better response than the 8 to 14 months." *Id.* at PageID 534 (emphasis added). The district court

appears to have explained that it felt it needed to impose a longer sentence *despite* Adams's mental health, not because of it, and that Adams's mental health concerns could no longer be treated as mitigating against jail time considering his flagrant violations of his supervised release conditions.

That decision was based on permissible factors. While our precedents support treating a defendant's mental health issues as a mitigating factor, we have never held that a defendant's mental health must *always* be treated as mitigating, notwithstanding the defendant's conduct. *See, e.g.*, *United States v. Owen*, 940 F.3d 308, 317 (6th Cir. 2019) ("While a district court should . . . give consideration to a defendant's mental illness, the court is not required to grant a defendant's motion for a downward variance whenever a defendant suffers from such an illness.").

Additionally, we recognize that in its sentencing decision, the district court referenced the competency report, which detailed Adams's multiple diagnoses (including the "violent ideations" Adams had expressed during the competency evaluation process) and commitment history. Sent'g Tr., R. 113, PageID 518, 530. In some contexts, a district court's reliance on statements made by medical professionals in a competency evaluation as a basis for a sentencing aggravator could raise significant concerns. For one thing, competency reports are generally not meant to assess dangerousness, or any § 3553(a) factor. *See* 18 U.S.C. § 4247(c). Rather, they serve to assess only whether a defendant is mentally competent to move forward with a criminal proceeding. For another, if relying on statements in competency reports as a basis for increased sentences became a regular practice, it could compromise the accuracy and comprehensiveness of such evaluations. Even when a defense attorney's client provided the attorney with reason to think that a competency evaluation was necessary, the attorney would need to weigh that course of action against the risk that medical statements made in the future competency report could be used against their client.

But here, we do not read these passing references to the competency evaluation as being the basis for the district court's sentencing decision. *See United States v. Liou*, 491 F.3d 334, 340 (6th Cir. 2007) (noting that we consider a sentencing court's statements in context). After observing that Adams had been physically violent despite its previous interventions, and thus

concluding that "society is not safe with [Adams] in it," the district court stated: "Not to mention some of the writings of the medical personnel who evaluated you, found you competent, but still full of rage and anger." Sent'g Tr., R. 113, PageID 531. In context, the district court referenced the medical evaluation only to reaffirm its view of Adams's conduct. It did not give "an extended criminal sentence" based on the report. *Moses*, 106 F.3d at 1281. Thus, we leave questions about the permissibility of relying on such reports and mental health status as an aggravating factor in sentencing for another day.[2] Because the district court relied on permissible factors in sentencing Adams, his challenge fails.

## CONCLUSION

We affirm the district court.

---

[2]While the district court appeared to reference the competency report positively, it also seemed to discount it and second-guess the severity of Adams's mental illness. It stated that during one of Adams's criminal offenses, he hadn't "even [been] acting as mentally ill as" the psychiatric report reflected, in part because he did not try to attack armed officers with his pliers when he was apprehended at the construction site. Sent'g Tr., R. 113, PageID 530. The court believed this demonstrated that while Adams "may have mental issues," he "want[s] to live," and therefore he "decide[s] when [he] want[s] to behave well and when [he doesn't]." *Id.* It is unclear based on the transcript that the district court's remarks were grounded in an evidence-based understanding of mental health, or whether the district court instead applied its own understanding of how someone with Adams's mental illness would generally behave. Regardless, this remark does not undermine our view that the district court's decision, fairly read, was based on Adams's conduct and not the report.